**R. L. LIVINGSTON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 57632.**

Court of Criminal Appeals of Texas, Panel No. 1.

March 28, 1979.

Rehearing En Banc Denied Nov. 28, 1979.

Matt Garcia, San Antonio, James S. Vecchio, Grand Prairie, for appellant.

Tim Curry, Dist. Atty., Marvin Collins, L. Tolly Wilson, Greg Pipes and Ronald G. Knight, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and PHILLIPS and TOM G. DAVIS, JJ.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for aggravated perjury. V.T.C.A. Penal Code, Sec. 37.03. Punishment, enhanced by one prior conviction, was assessed at 14 years and a $5,000 fine.

The basis of appellant's conviction was his testimony to a Tarrant County grand jury.[1] This grand jury was investigating

---

1. The record reflects that the appellant appeared voluntarily, was allowed to have counsel present during questioning, waived his right against self-incrimination, and answered the question under oath.

several allegations regarding the sexual abuse of children by the appellant. In the course of this investigation, a grand juror asked the appellant, "Have you ever, since you have been here in Fort Forth, Tarrant County, engaged in homosexual conduct, indecency with a child, sexual abuse of a child?" The appellant answered that he had not. After investigating these charges, this grand jury returned no indictments against the appellant.

A later grand jury returned the indictment in the present case, alleging that the appellant had perjured himself in answering the questions set out above. Appellant moved for a change of venue, and the case was transferred to Potter County.

The record reflects that the appellant was director of the Better Influence Association (B.I.A.), a youth organization in Fort Worth funded by the United Way. This organization worked to develop the potentials of children in the black community of Fort Worth. Children were sometimes referred to this organization by both the police and school authorities. Often this referral came after an arrest or some manifestation at school that the child was experiencing problems.

The B.I.A. was made up of a board of directors, the appellant as director, and other employees. The main activities of this association were counseling of children, holding classes such as arts and crafts, music, and dance, and providing a place for the children's recreation.

Appellant was accused of homosexual conduct with two boys who were members of B.I.A. Both boys had lived with appellant. The record reveals that at different times four to six boys would live with appellant at his home. Appellant would provide lodging for boys referred to the B.I.A. if for some reason they had no place to live.

Appellant contends that the trial court erred in allowing the State to cross-examine a defense witness with "have you heard questions" during the guilt stage of the trial. It is the appellant's contention that

this witness was not a reputation witness, thus impeachment by this method was improper.

The witness was A. B. O'Connor, a high school principal. After testifying as to his educational background, the witness gave the following testimony on direct examination:

"Q. All right. And in your professional capacity, either as a principal or functioning under any of the degrees that you possess, have you had occasion to work with the Better Influence Association in Fort Worth?

"A. Yes, sir.

"Q. Have you ever referred a problem student to the BIA?

"A. Yes, sir.

"Q. Have you referred more than one?

"A. Yes, sir.

"Q. And can you tell us approximately how many you have referred?

"A. I would say that in our high school over the period of approximately the last seven years, I would say I have called for assistance on at least a hundred.

"Q. And have you received assistance, sir?

"A. I have received excellent assistance, not only in understanding of the problem itself, but the wherewithal of the other areas of studies that I had, I found that the experience from the people I was discussing the problems with, we found better solutions.

"Q. And can you tell us approximately how many times you have had occasion to discuss problem students with R. L. Livingston himself?

"A. Well, I work very closely with Mr. Livingston. I referred to him as Mr. Cool all the time. This was approximately seven years ago.

"At that time, the high school that I was principal of was integrated, and

we brought in the 9th Grade, and the situation was rather tense.

"I was not familiar with all of the type of problems—

"MR. WILSON [prosecutor]: I object to this answer as not responsive.

"THE COURT: Yes. Mr. O'Connor, please just answer the question as it is asked.

"THE WITNESS: I didn't understand, I'm sorry.

"Q. (By Mr. Garcia [defense attorney]): And the high school at which you are presently principal, what is the ethnic make-up of the student body?

"A. Fifty-one percent black, thirty-four percent brown and approximately fourteen point something white.

"MR. GARCIA: Pass the witness."

This is the entire testimony elicited by defense counsel on direct examination.

The jury was removed and the prosecutor was allowed to question the witness as follows:

"Q. (By Mr. Wilson) Mr. O'Connor, would you say that R. L. Livingston is of good character?

"A. Yes, sir, to me, my relationship, sir.

"Q. All right. Now Mr. O'Connor, I would ask you, have you heard—

"MR. GARCIA: Your Honor, of course we are objecting to this being presented before jury.

"THE COURT: Yes, I understand."

The State then asked "have you heard questions" regarding a prior conviction in Lubbock County and six homosexual encounters with boys in Tarrant County.

The trial court ruled that the State could ask the "have you heard questions" in front of the jury. The trial court stated:

"THE COURT: Mr. Garcia, I don't intend to preclude you from making an argument. I will tell you, however, that it is the *opinion of the* Court, whether for right or wrong, that the entire defense has quite properly, I might add, been predicated upon tying together the Better Influence Association and the Defend-

ant as virtually one entity, and the last four witnesses have all testified as to either good character traits on the part of the Defendant, or good character traits on the part of the BIA.

"Therefore, I feel that the law is clear under the Child's Case and the cases which have come out since the Child's Case, that the have-you-heard questions may properly be asked.

"MR. GARCIA: Your Honor, we will respectfully except to the ruling of the Court, and in order to perfect our bill, we would like to call Mr. Wilson to the stand."

The appellant then questioned prosecutor Wilson relative to his good faith in asking the "have you heard" questions.

The State cross-examined witness O'Connor in the presence of the jury, asking:

"BY MR. WILSON:

"Q. Mr. O'Connor, I would ask you, sir, are you telling this jury that R. L. Livingston is of good character?

"A. Yes, sir.

"Q. Mr. O'Connor, have you heard that on the 26th day of October, 1964, in Lubbock County, Texas, this Defendant was convicted of the offense of sodomy with a 15-year-old Mexican boy named _____ and given five years in the State Penitentiary?

"A. No, sir.

"MR. GARCIA: Before you answer that question, just a moment. Your Honor, we are going to object to this question and we are going to object to any other further questions along these lines by Mr. O'Connor—by Mr. Wilson, and we would like to have a running objection on all inquiries by Mr. Wilson relative to this.

"THE COURT: All right. Your objection will be overruled, but you may have a running objection.

"MR. GARCIA: Thank you, sir.

"Q. (By Mr. Wilson) Have you heard, Mr. O'Connor, that in 1974, at the

home of R. L. Livingston, he put the penis of _____, a Negro boy, in his, R. L. Livingston's mouth?

"A. No."

The State asked other have you heard questions involving homosexual relations with some seven boys. At the end of its cross-examination, the State concluded by asking:

"Q. (By Mr. Wilson) If you had heard all of those things, Mr. O'Connor, would you still tell this jury that R. L. Livingston was of good character?

"A. That calls for a conclusion on my part, and I would have to check it out. But, under the information that I have, the answer would be I would not hesitate.

"MR. WILSON: We have no further questions."

On re-direct, defense counsel asked the witness:

"BY MR. GARCIA:

"Q. Mr. O'Connor, you say that you would not hesitate to say that Mr. Livingston is of good character?

"A. That's correct, sir.

"Q. From the information that you have on him and the work that he has done with you and your school—

"A. Yes, sir."

The State first urges that appellant's objections were general and did not preserve the error for our review. The record reveals that the court was on notice and understood the basis of appellant's objections. This is evidenced by the hearing outside the presence of the jury and the court's comments relative to the admissibility of the "have you heard" questions under the "Child's Case." See *Daniel v. State*, Tex.Cr. App., 550 S.W.2d 72; *Williams v. State*, Tex.Cr.App., 531 S.W.2d 606; *Price v. State*, Tex.Cr.App., 460 S.W.2d 420.

In its brief, the State points to the testimony of two other witnesses, in addition to O'Connor, that the State maintains were character witnesses and justified this use of "have you heard" questions. The State urges that:

"Even the trial court noted Appellant's entire defense had been predicated upon tying together the BIA and Appellant as one entity and that several witnesses had testified as to the good character traits of Appellant or the BIA."

The State concludes that this cross-examination was proper as the appellant had placed his character in issue by offering testimony regarding both himself and the B.I.A.

We find the following excerpts from the treatises helpful:

"At this date it should be too well understood to require comment that actual character is distinct from reputation which is merely evidence of character, but even today the term 'character' is often used in the sense both of actual disposition and of reputation. This tends to obscure an important distinction. The terms are not synonymous. Character refers to the inherent qualities of a person. Reputation applies to the collective opinion of the community as to those qualities. It should be kept clearly in mind that reputation is merely one of three modes of proving character, and is resorted to as evidence from which an inference may be drawn as to the nature of the actual trait." [Footnote omitted.]

2 *C. McCormick & R. Ray*, Texas Practice, Sec. 1324 (2d ed. 1956).

"In criminal cases, evidence of the character of the accused must be confined to proof of his general reputation in the community at or prior to the commission of the offense charged. Consequently, a witness, when testifying as to the character of the accused, must not give his private opinions on the matter or testify merely as to isolated acts of good or bad behavior. Moreover, when evidence of good character is offered by the accused, it must be related to traits bearing on the offense charged. Hence, evidence of incidental or irrelevant traits is inadmissible." [Footnotes omitted.]

23 *Tex.Jur.2d*, Evidence, Sec. 171 (1961). *See, Houghton v. State*, 345 S.W.2d 535;

*Smith v. State,* Tex.Cr.App., 414 S.W.2d 659.

 It is important to keep in mind that reputation is but one method to prove character. A reputation witness is a character witness insofar as his testimony inferentially proves character, but a witness whose testimony proves character by a method other than reputation is not a reputation witness. This distinction is important in determining what means of impeachment are proper to test the credibility of the witness. When specific acts of conduct that inferentially show the accused's character are admitted into evidence, the State is not automatically entitled to impeach the character witness as if his testimony had been reputation testimony.

Evidence of reputation offered to prove the character of the accused necessarily relies on hearsay. *Brown v. State,* Tex.Cr.App., 477 S.W.2d 617. This is because reputation is based on what the accused is *thought* to be, rather than what the accused is. *Brown v. State,* 477 S.W.2d 620. Thus when a witness testifies as to the reputation of the accused, this must be based on what he has heard from others in the community, rather than what he has personally observed. *Smith v. State,* Tex.Cr.App., 414 S.W.2d at 662.

 When a witness testifies to the accused's reputation in the community, the State may ask the witness "have you heard" questions to impeach the witness' testimony. The purpose of a "have you heard" question *is not to show the specific instances of bad conduct of the accused, but rather to test the credibility of the witness.* *Hurd v. State,* Tex.Cr.App., 513 S.W.2d 836; *Brown v. State,* Tex.Cr.App., 477 S.W.2d 617.

 Further, the State cannot place the accused's character into issue by its own cross-examination *and* then justify impeachment by "have you heard" questions based on the testimony elicited on cross-examination. *Els v. State,* Tex.Cr. App., 525 S.W.2d 11; cf. *Hatley v. State,*

Tex.Cr.App., 533 S.W.2d 27, 29. Thus, in the present case, unless O'Connor's testimony on direct justified his impeachment with "have you heard" questions, the impeachment was improper.

To determine if O'Connor's testimony justified the State's use of "have you heard" questions, we must review this Court's prior decisions regarding character and reputation evidence, and impeachment of witnesses testifying to both. Although a review of the cases reveals a distinction between character witness and reputation witness, the distinction is sometimes blurred.

The interchangeable use of reputation and character is illustrated in *Mitchell v. State,* Tex.Cr.App., 517 S.W.2d 282. In *Mitchell,* the defendant's wife testified as follows:

"On direct examination, appellant's wife was asked:

'Now, Mrs. Mitchell, you say you married Sanders (Sanders Mitchell, the appellant) in 1964. I will ask you whether or not you have ever seen any evidence of Sanders using any type of narcotic drugs?

'A No, sir.'

"We quote from the record of the cross-examination as follows:

'And you have never seen any evidence of Sanders using any type of narcotic drugs.

'A No, sir.

'Q Have you ever heard of Sanders using any type of narcotic drug?

'MR. GOODWIN (defense counsel): Well, if Your Honor please, I think she can answer the question, but it still would be hearsay and it is outside the scope of direct examination.

'THE COURT: Overruled.

'MR. DOYLE (prosecuting attorney): Mrs. Mitchell, have you ever heard—

'A I have heard of it . . . .'

"On re-direct by appellant's counsel:

'Was that marihuana?

'Yes, sir.' "

517 S.W.2d at 287. The Court made the following conclusion regarding this testimony:

"The record reflects that although the wife was not asked the 'magic words' concerning appellant's general reputation, the questions asked on direct examination as well as her entire testimony on direct were geared to show his *reputation* as to the use of narcotics and made of her a character witness in that respect. See *Childs v. State*, Tex.Cr.App., 491 S.W.2d 907; *Salazar v. State*, Tex.Cr.App., 494 S.W.2d 548; *Navajar v. State*, Tex.Cr. App., 496 S.W.2d 61.

"The question asked by the State to which objection was made was pertinent and germane to her testimony on direct examination." [Emphasis added.]

*Id.*

Although we find the result in *Mitchell* sound, the language used to support that conclusion can be misleading.

Mrs. Mitchell's testimony was not "reputation" evidence. Her testimony did not concern her knowledge of the defendant's reputation, but only her personal knowledge of one character trait. Her testimony was geared to show a *character trait* regarding the use of drugs, not *reputation*.

The State properly tested her credibility by asking whether she had heard of the defendant's use of narcotic drugs. Mrs. Mitchell's testimony inferentially proved that the defendant had a particular character trait, and good faith questions asking if she had heard of acts by defendant inconsistent with the character trait were proper.

In *Mitchell*, it was correctly stated that the "have you heard" questions were proper as they were pertinent and germane to her testimony. It was not because she testified to the defendant's reputation, however, but because she testified as to a character trait.

In *Childs v. State*, Tex.Cr.App., 491 S.W.2d 907, and cases following this decision, this Court held that even without questions specifically inquiring into reputation, that a witness who testifies to the "good character and law abiding habits" of a defendant can be cross-examined as if a reputation witness. In *Childs* the testimony was:

"Ground of error number 1 relates to the testimony of appellant's father at the hearing on punishment. He testified, on direct examination, that he joined with his son in requesting the jury to grant the appellant probation. He further stated that he would keep appellant at his home, employ him and supervise his conduct and assist him in maintaining exemplary conduct. He also testified:

'Q. [Defense attorney] . . . And has his conduct been good since he has been there while he has been there at home?

'A. [Witness] Really has.'

"On cross-examination the witness admitted that the effect of his answers to counsel's questions had been to tell the jury that his son was 'of good character'. He was then asked over appellant's objection if 'he had heard' that his son, the appellant, had been indicted for robbery and for possession of marihuana and was living with a prostitute who was also a heroin addict."

Again, this witness' testimony was not "reputation" testimony in that it was not based on hearsay knowledge of the defendant's reputation in the community. The father's assertion that the defendant had been "good" was evidence of specific conduct by the defendant, thus the father was a character witness and not a reputation witness.

The statement that the defendant had been "good" would tend to show that the defendant possessed more than one character trait that was good. An inference could be drawn from this testimony regarding such character traits as being peaceful, law-abiding, and engaging in conduct conforming to the social norm. Thus, the statement that the defendant had been "good" encompassed a broad range of character traits, going so far as to infer a general good character.

The State's use of "have you heard" questions was proper to test the witness' knowl-

edge of specific acts of misconduct inconsistent with the character traits implied by the father's broad assertion. Again it should be noted that this impeachment was not proper because the witness was a reputation witness, but because he was a character witness.

A contrast of *Childs* and *Mitchell* emphasizes the different factual situations and the different specific instances of conduct that could be used to impeach. In *Childs*, the witness made a sweeping assertion that would infer the general good character of the accused, where in *Mitchell*, the witness testified to a narrow course of conduct that inferred only one specific character trait was good. In *Childs* the State impeached with specific instances of conduct inconsistent with the inference of general good character, while in *Mitchell* the State impeached with a specific instance of conduct inconsistent with the single character trait involved. In both cases the State impeached the witness with "have you heard" questions after proof of character by instances of conduct and not after any proof of reputation.

In *Els v. State*, 525 S.W.2d 11, this Court held that impeachment by "have you heard" questions was improper. In *Els*, the defendant was being tried for the murder of the witness' daughter. The witness testified to specific acts of conduct by the defendant while in her presence and to the relationship between her daughter and the defendant. In contrast to the testimony in *Childs*, this testimony made no sweeping assertion inferring generally good character. Instead the testimony showed the defendant to be helpful and considerate of this witness, and involved romantically with her daughter. Here, as in *Mitchell*, the testimony revealed only specific character traits.

The State did not limit its impeachment to specific instances of conduct inconsistent with the character traits to which the witness testified. Instead, the State asked about defendant's prior conduct involving indecent exposure, carrying a pistol, and burglary. Although this conduct would be

inconsistent with testimony inferring that the defendant's general character was good, it was not inconsistent with the character traits testified to by the witness. This Court reversed the conviction in *Els*.

◼ From the cases above we can draw the following conclusions. When a witness testifies to conduct of the defendant that is so broad as to infer that the defendant has good general character, the witness' credibility can be impeached with "have you heard" questions involving specific instances of misconduct inconsistent with generally good character. But when a witness testifies to instances of conduct that go no further than to imply that specific traits of character are good, the witness can be impeached with "have you heard" questions involving only those instances of misconduct inconsistent with the specific character traits placed in issue.

In the present case, the witness testified that he referred children to B.I.A., that he received assistance from B.I.A., and that he had worked closely with the appellant. This is not the broad assertion of general good character made in *Childs*. The appellant's character and the effectiveness of the B.I.A. is not one and the same. The B.I.A. could have been viewed as an effective organization regardless of the appellant's conduct.

◼ In the present case, the testimony inferentially concerned, *at best*, specific, narrow character traits of appellant. Instances of conduct inconsistent with the testimony of O'Connor would have been proper impeachment. The instances of misconduct used by the State in the "have you heard" questions were not proper to test the credibility of this witness. These specific instances of misconduct were not inconsistent with any character trait introduced during direct examination. We hold that the State's attempted impeachment of O'Connor was improper.

The questions asked the witness on cross-examination involved eight instances of homosexual conduct. Although appellant's prior conviction involving homosexual con-

duct was later entered into evidence without objection, these eight other instances of prior homosexual conduct were before the jury only during this cross-examination of O'Connor. The improper asking of these questions was harmful and prejudicial to the defendant. *See, Els v. State, supra,* and cases cited therein.

The judgment is reversed and the cause remanded.