**Thomas Michael WIGGINS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05-87-01049-CR.**

Court of Appeals of Texas,
Dallas.
Aug. 17, 1989.
Discretionary Review Refused
Dec. 13, 1989.

Arch C. McColl, David W. Coody, Dallas, for appellant.

Anne B. Wetherholt, Dallas, for appellee.

Before HOWELL, LAGARDE and WHITTINGTON, JJ.

LAGARDE, Justice.

Thomas Michael Wiggins appeals his jury conviction for the offense of aggravated sexual assault, for which the jury assessed punishment at twenty-five years' confinement. In seven points of error, Wiggins claims that the trial court committed harmful error by: (1) admitting the testimony of a rebuttal witness regarding an extraneous offense; (2) permitting the State to ask "have you heard" questions of a defense witness after she testified about Wiggins's character for truthfulness and "honesty"; (3) failing to instruct the jury to disregard testimony of a defense witness about Wiggins's "honesty"; (4) and (5) permitting the State to cross-examine Wiggins about whether he had been fired by two former employers; and (6) and (7) overruling Wiggins's objection to the charge based on the trial court's failure to include an instruction on the possible probation terms of psychological treatment and incarceration for up to 120 days. For the reasons that follow, we affirm.

The facts in this case show that Wiggins met the victim for the first time on December 5, 1985, while both were attending a Christmas party held at a tanning salon. During a short conversation, they discussed the fact that they both lived in the same apartment complex. When the party broke up, Wiggins and the victim each signed the guest register and left to go their separate ways.

The victim returned to her apartment and changed into a sweat suit in preparation for bed. Shortly, Wiggins knocked on her door, and she let him in. Suggesting that they go to the hot tub, Wiggins said that he would go home and get a bottle of wine. The victim agreed. Wiggins left, and she changed into a swimsuit, put her sweat suit on over the swimsuit, and walked out to the hot tub. As the victim started to leave the hot tub and return to her apartment, after having decided Wiggins was not going to appear, Wiggins walked up with a bottle of wine. He had not changed his clothes, and he said that he thought he had left his keys in the victim's apartment. They went back to the victim's apartment to look for his keys but were unable to find them. Wiggins suggested that they just watch television or something instead of going back down to the hot tub, so they sat in her apartment, watched MTV, and talked. Wiggins then tried to kiss her. She put her hands up, stating that it was late and that she had to get up early. He tried to kiss her again. Once more, she stated that she had to get up early the next day.

Wiggins then got up off the couch and walked out of her apartment. At first, she thought that he might be leaving, but then she heard him throwing up outside. He did not leave; instead, he walked back into her apartment and sat down. Eventually, he tried to kiss her again. She resisted and, for a third time, said she needed to get up early the next morning. Wiggins sat back down but, after a short period of time, he picked up his wine bottle and walked into the kitchen. The victim heard Wiggins in the kitchen rattling utensils. After returning to the living room, he unzipped his pants, walked over, and tried to kiss her again. This time, when she pushed him away, he showed her that he had a knife in his hand and threatened her.

Still holding the knife, Wiggins ordered her to sit on the floor and take off her sweat top and pants. She pleaded with him

to stop. Refusing, he undressed, put on a condom, pushed her onto her back, and got on top of her. She was cut by the knife, which was pressed up against her fingers. He then committed penile penetration. At one point, he put the knife to her throat and started whispering the Lord's Prayer in her ear. In the process of committing digital penetration, he put the knife down; she grabbed it. During the struggle which ensued, he put his hand over her mouth preventing her from breathing. Although she still had the knife, she was afraid to use it. He told her that he had been stabbed before and confirmed his statement by showing her a scar. He told her that, if she stabbed him but did not kill him, he would kill her.

Asking her if she had ever "done it up the butt," he forced her to get on her hands and knees and proceeded to attempt anal intercourse. Still on her hands and knees, the victim began inching forward toward the front door. She tried to grab the door handle and lock, but her hands, covered with blood, slipped and she was unable to get the door open. They struggled again, and Wiggins forced her away from the door. Unsuccessful in his attempts at anal intercourse, Wiggins then demanded that she perform fellatio. After several unsuccessful attempts to have oral sex, Wiggins said, "[w]ell, I give up." He poured water on the blood on the carpet, rinsed himself off, told her that he would come back if she told anyone, and then he left. The entire episode covered a period of approximately four hours. With these facts in mind, we will now address Wiggins's seven points of error.

### Extraneous Offense

In his first point of error, Wiggins asserts that the trial court erred in admitting, over objection, rebuttal evidence of an extraneous sexual assault to prove Wiggins's intent. We disagree. Although the extraneous offense will be set out in some detail later in this discussion, we note that the extraneous offense involved a young woman who agreed to go for a ride in Wiggins's "Vette." According to the woman, Wiggins stopped his vehicle in a parking lot

and forced her to engage in oral sodomy and threatened to force her to engage in anal sodomy.

Generally, a defendant is entitled to be tried on the accusation in the State's pleading and not on some collateral crime or for being a criminal generally. *Cantrell v. State*, 731 S.W.2d 84, 88 (Tex.Crim.App. 1987). However, there are exceptions to the general rule that extraneous offenses are inadmissible. *Id.* at 88–89. The regularly recognized exceptions are: (1) to show the context in which the criminal act occurred; (2) to circumstantially prove identity where the State lacks direct evidence; (3) to prove scienter where intent or guilty knowledge is an essential element of the offense; (4) to prove malice or state of mind; (5) to show the accused's motive; or (6) to refute a defensive theory raised by the accused. *See id.* at 89, *quoting Albrecht v. State*, 486 S.W.2d 97, 100–101 (Tex.Crim.App.1972).

Although the enumerated exceptions are regularly recognized, they are not automatic. *See Boutwell v. State*, 719 S.W.2d 164, 174 (Tex.Crim.App.1985) (op. on reh'g). As the court in *Boutwell* held, "The danger of rote application of general rules is that they focus on 'admissibility' rather than the logical analysis all evidence must withstand to determine admissibility." *Id.* at 172. The "logical analysis" referred to in *Boutwell* is also called the "true test" for the admissibility of extraneous offense evidence. *See Cantrell*, 731 S.W.2d at 89; *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App.1983).

The test has been stated as follows: "Every case must be examined on its own facts, strengths, and weaknesses to determine whether the extraneous transaction is relevant to a material issue, and whether the relevance value outweighs the prejudicial potential." *Boutwell*, 719 S.W.2d at 174. *See also Hargraves v. State*, 738 S.W.2d 743, 748 (Tex.App.—Dallas 1987, pet. ref'd). This Court has broken down the test into two primary parts: (1) whether the extraneous offense is relevant to a material contested issue in the case other

than the appellant's character, and (2) whether the probative value of the extraneous offense outweighs its prejudicial effect. *See Hargraves*, 738 S.W.2d at 748.

### Relevancy to Material Issue

 We will first examine the question of relevancy of the extraneous offense to a material contested issue in this case. *See Reed v. State*, 751 S.W.2d 607, 611 (Tex.App.—Dallas 1988, no pet.). Where intent or guilty knowledge is an essential element of the offense, which the State must prove to obtain a conviction, its materiality goes without saying. *Cantrell*, 731 S.W.2d at 89, *quoting Morgan v. State*, 692 S.W.2d 877, 880 (Tex.Crim.App.1985). Here, the State must prove, in pertinent part, that Wiggins did "intentionally cause penetration ... without the consent of the complainant."[1] Intent, therefore, is one of the *material* issues that is raised by the State's pleading.

Next, we must determine whether intent was a contested issue in this case. *See Reed*, 751 S.W.2d at 611. Consequently, we must decide if Wiggins raised the issue of intent during the trial of this case. *Id.* Wiggins contends on appeal that the only issue before the jury was whether, as contended by the complainant, Wiggins forcibly had nonconsensual sexual intercourse with her at knifepoint, or whether, as Wiggins testified, he never had intercourse with the complainant at all. Wiggins argues that intent was not a material contested issue, but, rather, the key dispute was whether Wiggins committed the specific act of penetration of the complainant's female sexual organ with his sexual organ. In other words, Wiggins asserts that the specific offense, as indicted, never occurred, not that it consensually occurred. Wiggins argues, therefore, that the extraneous offense was improperly admitted because consent was not a contested issue.

Of course, we cannot merely rely on Wiggins's assertion, on appeal, that he intended to contest only the issue of penetration and not the issue of consent. Instead, we must look to the testimony at trial to determine the contested issue or issues. In response to questions by the State, the victim testified, in part:

Q What happened next when you saw him holding his hand that way? Did he approach you?

A Well, yeah, he started to walk over towards me. He came around the coffee table from the other side of where I was sitting. He started to, you know, bend over towards where I was sitting. That time I knew he was going to try and kiss me again or do something again, so I pushed up my hands and physically tried to push him away and at the same time that's when he pulled out his right arm and showed me the knife in it. It was a steak knife from the kitchen drawer.

. . . .

Q What was going through your mind at this time, Ann?

A I thought he was going to kill me. I didn't know what he wanted. Mainly just fear. I can't remember specifically what was going through my mind at the time. The next thing that happened was, he—well, his whole demeanor changed, you know, at that moment. It was like night and day. He started talking in a really angry voice.

Q How would you describe his demeanor or the sound of his voice?

A I would say menacing or threatening, hissing like he was talking through his teeth and saying, you know—he said to me, "Go sit down on the floor." and he was using his arm with the knife in it to point, you know.

Q What happened next? Did you do that?

---

**1.** Omitting the formal parts, the indictment reads: "did unlawfully, then and there knowingly and intentionally cause penetration of the female sexual organ of ..., hereinafter called the complainant, a person not the spouse of the defendant, without the consent of the complainant by means of an object, to-wit: the sexual organ of THOMAS MICHAEL WIGGINS, and, in the course of this same criminal episode, used and exhibited a deadly weapon, to-wit: a knife."

A Well, yeah. Yeah, I went over and I sat down on the floor.

Q Were you still frightened at this point?

A Yes. I think I was hyperventilating or something and at the same time I was trying to protest and trying to get him to stop. I said things. One thing I said to him—you know, one of the first things I said to him was—you know, I was trying to use just about any tactic just to get him away from me and to get him to stop. I said, "You're so good looking, you could probably have any girl you wanted. What do you want with me?" He said, "I like your tits." real angrily, like that. That's when I knew there was no reasoning with him.

. . . .

Q Is he still talking in this hissing manner?

A Yes. And I did. I was still protesting.

Q This is the sweat top?

A Right. I kept saying "No", "Please" and I don't remember anything specific about what I said, but I just kept on protesting. Then he told me to take off my pants. That's when I really started protesting a lot more and I said, "Please don't do this. I'm a virgin," which I was. I don't think he believed me or he just ignored it or something.

. . . .

Q Is he undressed at this point?

A Yes.

Q And is this the point where he attempted to have sexual intercourse with you?

A Well, he pushed me back.

Q Pushed you back where, onto your back?

A Onto my back with my hands up against the floor at my sides.

Q And he still has a knife?

A He still had the knife and it was in his right hand which explains how my right hand got cut. I mean, he was holding it against my palm and with his other hand he was holding either my upper arm or my lower arm. I don't remember.

. . . .

A That's when he—I think that's when he proceeded with the rape.

Q By "rape" do you mean that he put his sexual organ in your sexual organ? Is that what you mean?

A Yes.

Q Is he still holding, I guess, the knife in this hand, in his right hand, and holding both your arms or hands down, is that correct, while this was going on?

A Yes.

. . . .

Q Let me ask you, Ann. Did this Defendant place his sexual organ in your sexual organ?

A Yes.

Q Was that with your consent or without your consent?

A Without.

Q When I say "place", he penetrated your female sexual organ; is that correct?

A Yes.

Wiggins, on the other hand, claims that all the sexual contact that actually occurred was consensual, and he claims that there was no penile penetration either consensually or nonconsensually. In response to defense counsel's questions, Wiggins testified, in pertinent part:

Q Now, let me ask you this: Did you ever penetrate her female sexual organ with your male sexual organ?

A No, I did not.

Q Did you ever penetrate it to any degree?

A No.

Q Did you penetrate her female sexual organ with your fingers?

A Yes, I did.

Q Was that on several occasions?

A Yes.

Q Did you ever do so without her consent?

A No.

Q Did you ever consider that anything that you did was without her consent right up until the time that she started objecting at the end about having sexual intercourse?

A No. I thought this girl—I mean, I thought this girl liked me and I could not understand why—I just don't know.

. . . .

Q All right, sir. Now, Thomas Michael Wiggins, you are accused of penetrating the sexual organ of [complainant] with your sex organ. I want you to tell me and I want you to tell the members of this jury, did you ever penetrate her sexual organ with your sexual organ at any time?

A No, I did not.

Q The contact that you did have with her during that entire night, did you ever perceive any objection to that contact by her right up until the time that—at the very end there?

A I was under the assumption the whole time that this girl liked me. We were getting along very well. I never had any inclination as to any negative feelings.

Q Now, you heard her testify that you're the one that earlier on in the evening went and got a knife in the kitchen and came out there and cut her with a knife. You heard her say that?

A Yes, I did.

Q Is that true or is it not?

A No, I did not.

Q Did you ever have a hold of the stock, the wooden stock, of that knife, if this is the knife, the wooden stock of it?

A No, I did not. I did not control that knife at any time.

Q Did you ever get it away from her?

A No, I did not.

Q Did you have intercourse with her without her consent?

A No, I did not.

Q Did you have intercourse with her with her consent? Did you have intercourse with her at all?

A I did not have sexual intercourse with [complainant].

Q If the definition of penetration is any penetration however slight by your male organ of her female organ, did you penetrate her at all with you male organ?

A No, I did not.

Q Did you penetrate her with your fingers?

A Yes, I did.

Q Did it appear to you that it was all consensual?

A Yes.

Q If she had asked you to leave or indicated to you that she wanted you to leave at any time, would you have left?

A Yes, I would have.

As we read Wiggins's testimony, he is claiming that he never penetrated the victim's female sexual organ with his male sexual organ, and he is also claiming that all sexual contact that did occur was consensual. The victim claims that he did place his sexual organ in her sexual organ without her consent. Of course, the jury, or the trial judge in a trial before the court, is the sole judge of credibility of witnesses and may accept or reject any part or all testimony given by State or defense witnesses. *Johnson v. State*, 571 S.W.2d 170, 173 (Tex.Crim.App.1978).

█ In line with this rationale, the jury could have disbelieved Wiggins's contention that he did not penetrate the victim's female sexual organ with his male sexual organ. However, the jury could have believed Wiggins when he responded affirmatively to the question of "[d]id it appear to you that it was *all* consensual?" (emphasis added). The jury could conceivably have disbelieved Wiggins's claim that there was no penetration and believed his claim that "it was *all* consensual," (*i.e.*, "*all* " interpreted as including penile penetration). Therefore, the testimony could be construed as placing consent in issue.

When the defensive theory of consent is raised, a defendant necessarily disputes his intent to do the act without the consent of the complainant, and his intent is thereby

placed in issue. *See Rubio v. State*, 607 S.W.2d 498, 501 (Tex.Crim.App.1980). In this instance, the trial court was in a much better position to determine if consent (*i.e.*, intent) was contested by Wiggins. In this regard, we note that the trial court, in deciding to allow the extraneous offense, stated in pertinent part: "For the benefit again of the record, Mr. Hinton, I am relying some, that [sic] entirely on Rubio versus State...." We read *Rubio* as dealing with the admission of an extraneous offense to show lack of consent. The trial court gave a limiting instruction to the jury to only consider the extraneous offense in determining intent. Implicit in the trial court's determination that the extraneous offense was admissible is the determination that, objectively, consent was a contested issue.

The Texas Court of Criminal Appeals has held that the trial judge's discretion in admitting an extraneous offense is to be given due deference. *Cantrell*, 731 S.W.2d at 90. Absent a clear abuse of discretion, the trial court's decision will not be disturbed on appeal. *Templin v. State*, 711 S.W.2d 30, 33 (Tex.Crim.App.1986); *Long v. State*, 739 S.W.2d 98, 105 (Tex.App.—Beaumont 1987, pet. granted); *Stokes v. State*, 695 S.W.2d 205, 206 (Tex.App.—Tyler 1984, no pet.). When determining whether a trial court abused its discretion in making a finding, appellate courts usually hold that, if there is evidence in the record to support the trial court's finding, there is no abuse of discretion. *Cf. Ex parte Haliburton*, 755 S.W.2d 131, 135 (Tex.Crim.App.1988) (finding that the State did not use peremptory challenges to strike minorities); *Eddlemon v. State*, 591 S.W.2d 847, 849 (Tex. Crim.App.1979) (finding in motion for new trial based on newly discovered evidence); *Lossman v. State*, 668 S.W.2d 504, 507 (Tex.App.—Fort Worth 1984, no pet.) (finding that condition of probation broken); *Taylor v. State*, 630 S.W.2d 824, 826 (Tex. App.—Houston [1st Dist.] 1982, no pet.) (finding on voluntariness of confession). Additionally, abuse of discretion is generally associated with acts that are arbitrary, unreasonable, or capricious. *See* BLACK'S LAW DICTIONARY 10 (5th ed. 1979). *Cf.*

*Smith v. County Auditor*, 728 S.W.2d 784, 787 (Tex.Crim.App.1987) (trial court's award of attorney fees); *Miller v. State*, 755 S.W.2d 211, 217 (Tex.App.—Dallas 1988, pet. granted) (trial court's award of attorney fees). We hold that the trial court, in implicitly finding that consent was contested, had some evidence on which to base its finding. Additionally, we cannot say that the trial court's implicit finding was arbitrary, unreasonable, or capricious. For these reasons, the trial court did not abuse its discretion in making its implicit finding that consent (*i.e.*, intent) was a contested issue.

■■■ Having determined that the trial court did not abuse its discretion in finding that intent was a material contested issue, we turn now to whether the extraneous offense was relevant to the material issue of intent. Relevancy is that which makes the proposition at issue more or less probable. *Garza v. State*, 715 S.W.2d 642, 644 (Tex.Crim.App.1986). The Court of Criminal Appeals has stated:

> [W]here the material issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extraneous offense derives purely from the point of view of the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning namely, that an unusual and abnormal element might perhaps be present in one instant [sic], but that the oftener [sic] similar instances occur with similar results, the less likely is the abnormal element likely, to be the true explanation of them.

*Cantrell*, 731 S.W.2d at 90, *quoting Plante v. State*, 692 S.W.2d 487, 491–92 (Tex.Crim. App.1985).

This rationale is referred to as the "doctrine of chances." *See Cantrell*, 731

S.W.2d at 90; *Scott v. State*, 720 S.W.2d 264, 266 (Tex.App.—Austin 1986, pet. ref'd). If the appellant's conduct was capable of both an innocent and a criminal interpretation, the "doctrine of chances" can be utilized to prove the unlikelihood of the innocent explanation. *See Scott*, 720 S.W.2d at 267. Here, standing alone, either the charged offense or the extraneous offense could conceivably have been unintentional, but it strains credibility to assert that two such unintentional incidents occurred. *See id.* Clearly, the evidence of the extraneous sexual assault was highly relevant to the credibility of Wiggins's defensive issue. *See id.* In conclusion, the truth of Wiggins's assertion that the victim consented to certain sexual acts was certainly a material issue in the case, and the extraneous offense was relevant to that material issue.

### Probative Value vs. Prejudicial Effect

Proceeding to the next prong, we must determine if the probative value of the extraneous offense outweighs its prejudicial effect. Stated differently, we must determine whether the admission of the extraneous offense would assist the jury in resolving the contested issue of intent. *See Williams*, 662 S.W.2d at 346, *quoting Elkins v. State*, 647 S.W.2d 663, 665 (Tex. Crim.App. 1983). In making this determination, Texas courts have consistently looked at two primary factors: (1) the State's *need* for the evidence to prove the contested issue; and (2) the similarity and remoteness of the extraneous offense to the charged offense.

▇▇▇▇ As for the State's need to prove intent, if the element that the State seeks to prove is an element in its case in chief, which can be readily inferred from uncontested direct evidence, the need is slight, and the extraneous offense is inadmissible. *See Cantrell*, 731 S.W.2d at 89; *see also Boutwell*, 719 S.W.2d at 175; *Robinson v. State*, 701 S.W.2d 895, 898–99 (Tex.Crim. App.1985); *Williams*, 662 S.W.2d at 346. The victim testified that Wiggins committed nonconsensual penile penetration. Wiggins testified that there was no penile penetration with or without the victim's consent. Therefore, the element of consent (*i.e.*, intent) cannot be readily inferred from *uncontested* direct evidence, so the State's need is great enough to warrant admission of the offense.

▇▇▇▇ We next consider the factor of similarity of the extraneous offense to the charged offense. Initially, we note that an extremely high degree of similarity is not required where intent, as opposed to identity, is the material issue. *See Cantrell*, 731 S.W.2d at 90. Nevertheless, there are a great many similarities between this offense and the extraneous offense. Wiggins asked the victim of the extraneous offense to take a ride in his "Vette." However, at approximately 12:30 a.m., Wiggins pulled into a church parking lot and forced the victim to perform fellatio. He made comments such as "I don't want to hurt you," and "I'll let you go once I get off—once you get me off," and "[d]on't use your teeth" and "don't hurt him." At one point, the victim tried to escape. When Wiggins caught her, they struggled, and Wiggins threatened to have anal sex with her. He then made the comments that "[g]irls like to be butt fucked," and "[y]our [sic] going to love it." Eventually, the victim managed to escape.

The charged offense here is very similar. After meeting the victim at a social function, Wiggins went, uninvited, to the victim's apartment at approximately 11:00 p.m. He first asked her to sit in the hot tub with him. However, he then claimed that he had left his keys in her apartment. Once they were alone in the victim's apartment, Wiggins forced the victim to perform fellatio, sexual intercourse and digital penetration. He made the comment, "I'm not leaving until I get off." He also made the comments "[d]on't use your teeth" and "[d]on't bite him." Following a struggle with the victim, he forced her to get on her hands and knees and asked her if she had ever "done it up the butt." After four hours of sexually abusing the victim, Wiggins made the comment "[w]ell, I give up," and he left at approximately 3:00 a.m. Clearly, there are a great many similarities

between the extraneous offense and the charged offense.

Thus, after carefully examining this case on the facts, strengths, and weaknesses, for the reasons stated above we conclude that the extraneous offense was relevant to the material contested issue of intent, and the relevancy value of the extraneous offense outweighed its prejudicial potential. Consequently, it was properly admitted.

Additionally, we note that the trial judge's discretion in admitting an extraneous offense is to be given due deference. *Cantrell*, 731 S.W.2d at 90. Moreover, the Court of Criminal Appeals has consistently held that when a defendant raises a defensive theory of lack of intent to wrongfully engage in criminal conduct, an extraneous offense is admissible by way of rebuttal on the issue of intent. *Rubio v. State*, 607 S.W.2d at 500–01. For all of these reasons, we overrule Wiggins's first point of error.

### *"Have You Heard" Questions*

In his second point of error, Wiggins claims that the trial court erred in allowing the State, during the guilt-innocence phase, to ask "have you heard" questions to impeach the opinion testimony of Wiggins's mother on the issue of Wiggins's truthfulness. On appeal, Wiggins specifically claims that the "have you heard" questions were improper because: (1) Mrs. Wiggins's testimony on direct examination did not open the door for "have you heard" questions since her answers only pertained to truthfulness; (2) Mrs. Wiggins's testimony was given in the form of an opinion; and (3) Mrs. Wiggins's testimony was inadmissible under rule 608(a) of the Texas Rules of Criminal Evidence; therefore, the door was never opened for the State to impeach the witness. Although this point of error is obviously multifarious, in the interest of justice, we will address each assertion.

Following Wiggins's testimony in his own behalf, during the guilt-innocence phase, the questions of Wiggins's truthfulness and honesty came up in the following exchange, on direct examination, between defense counsel and Wiggins's mother:

Q (Defense counsel) Now, I want to ask you have you an opinion as to whether or not he tells the truth? Do you have an opinion as to whether or not Thomas Michael Wiggins, your son, is a truth teller?

A *Michael is an honest person.*

Q Does he tell the truth?

A Yes, he does tell the truth.

Q Can you tell this jury whether or not, in your opinion, he is capable of belief under oath?

A Yes, he is.

. . . .

Q What you're here to tell the jury is, in your opinion Michael Wiggins is capable of belief under oath and is a truth teller?

A Yes, he is.

(Emphasis added.)

No objection to, or motion to strike, the emphasized language was made by either defense counsel or the State at the time of the response. However, at the conclusion of direct examination, the jury was retired to allow the State to make an offer of proof on several "have you heard" questions, including whether the witness knew that Wiggins: (1) stole money at college parties; (2) pled guilty to having stolen shoes at the Back Stage shoe store in Kansas in 1983; (3) burglarized a vehicle in December of 1981 in Omaha; (4) received a two-year probated sentence for receiving and concealing stolen property in 1983 in Omaha; (5) had been expelled from the Bounds Modeling School in 1983 or 1984 for having stolen clothes; and (6) was given a choice of being fired or leaving his employment for having taken an automobile from the Happy Hollow Country Club without the owner's consent.

During the offer of proof outside the jury's presence, Mrs. Wiggins responded that she had heard of the receiving and concealing and the unauthorized use offenses and both admitted and denied that she had heard of the burglary offense. She indicated she had not heard of Wiggins's having stolen the money, shoes, or clothes, and further responded that if she

had heard of those incidents that she would not consider Wiggins an "honest" person; however, she would still consider him a truthful person. Defense counsel elicited testimony from Mrs. Wiggins that her "honesty" answer before the jury was an inadvertent or mistaken response and he sought to have it withdrawn at that time. The trial court denied his request and, with some limitations as to form and detail of the questions, allowed the State to cross-examine Mrs. Wiggins before the jury about the enumerated specific acts of misconduct. The trial court gave the jury a limiting instruction. The written instruction read:

> Certain questions were asked by the State inquiring of character witnesses for the defendant whether they had heard about other offenses on the part of the defendant. You are instructed that you may not consider such questions, nor may you consider any answers of such witnesses as to whether they had heard of any other offenses, if any such answers were given, as any evidence of guilt in this case, but only for the purpose of testing (if it does) the knowledge of such witnesses as to the defendant's *reputation* and the weight to be given to their testimony; and you must not consider such questions and answers in regard to any other offenses, if any, for any other purpose whatsoever.

(Emphasis added.)

Before the jury, the State limited its cross-examination of Mrs. Wiggins to whether her opinion concerning Wiggins's *honesty* was changed by the "have you heards" and Mrs. Wiggins answered that after having heard about those incidents she would conclude that "he is not that honest." The State did not question Mrs. Wiggins before the jury concerning the effect of the "have you heards" on her opinion of her son's *truthfulness*. On redirect, however, the defense developed that her answer concerning honesty was accidental, inadvertent, and unintended, and

that her opinion of her son's truthfulness remained unchanged.

Wiggins first argues that Mrs. Wiggins only *intended* to state that Wiggins was a *truthful* person, not an *honest* person; consequently, the State could only inquire into specific instances of misconduct that were inconsistent with truthfulness. Such inconsistency is required before a "have you heard" question may be asked. *Livingston v. State*, 589 S.W.2d 395, 402 (Tex. Crim.App.1979). Wiggins asserts that the specific instances of misconduct about which the State inquired were not inconsistent with truthfulness and, thus, were improper. The State, on the other hand, argues that honesty and truthfulness are the same character trait, and relies on *Rochester v. State*, 659 S.W.2d 834, 835 (Tex. Crim.App.1983) in arguing that the conduct was inconsistent with truthfulness. In *Rochester*, "have you heard" questions about specific instances of swindle over $50, theft by false pretext, obtaining money under false pretense, and petty larceny by fraud were held to be properly admitted as "directly related to appellant's truth and veracity and ... not subject to the objection of lack of inconsistency with that specific character trait." *Rochester*, 659 S.W.2d at 835.

Wiggins argues that *Rochester* actually supports his position here because in this case the specific acts *do not* involve fraud, false statements, or swindling, which would go to the trait of truthfulness. He further relies on federal authority [2] interpreting rule 608 of the Federal Rules of Evidence, which holds that in order to be probative of untruthfulness the acts must be related to *crimen falsi, e.g.,* perjury, subornation of perjury, fraud, swindling, forgery, bribery, or embezzlement. He also relies on *Rhodes v. State*, 276 Ark. 203, 634 S.W.2d 107, 111 (1982) in which the Arkansas Supreme Court prospectively held that shoplifting was not misconduct probative of the issue of truthfulness.[3]

---

2. Specifically, he relies on *United States v. Leake*, 642 F.2d 715, 718 (4th Cir.1981) and *United States v. Dennis*, 625 F.2d 782, 798 (8th Cir.1980).

3. The Court reversed Rhodes's conviction for failure of the trial court to allow cross-examination of a codefendant by questions about previous incidents of shoplifting; however, largely

*Rhodes* relied on *United States v. Ortega*, 561 F.2d 803 (9th Cir.1977) which held that the "dishonesty and false statement" language [of the federal rule] should be limited to "those crimes that involve some element of misrepresentation or other indicium of a propensity to lie and excluding those crimes which, bad though they are, do not carry with them a tinge of falsification." *Ortega*, 561 F.2d at 805. *But cf. United States v. Carden*, 529 F.2d 443, 446 (5th Cir.1976) (concluding that impeachment evidence was admissible since the crime at issue [petty larceny] involved dishonesty).

Case law concerning the distinction, if any, in the two character traits is confusing. Some cases seem to draw a distinction between *truth and veracity* and *honest and law-abiding*. In *Spivey v. State*, 748 S.W.2d 18, 20 (Tex.App.—Houston [1st Dist.] 1988, no pet.), the court distinguishes the character trait of truth and veracity from the character trait of honesty. In doing so, the court cites *Pine v. State*, 134 Tex.Crim. 396, 115 S.W.2d 918 (1938), which stands for the proposition that reputation of a defendant's character as an *honest and law-abiding* citizen is admissible in a case where the defendant is charged with a crime of moral turpitude (*i.e.*, receiving and concealing stolen property). In *Cortez v. State*, 735 S.W.2d 294, 299 (Tex.App.—Dallas 1987, no pet.), this Court simply stated that the record reflected evidence of the defendant's reputation as an *honest, law-abiding* citizen.

At least one case seems to draw a distinction between *peaceful and law-abiding* and *truthful and honest*. In *Templeton v. State*, 153 Tex.Crim. 16, 216 S.W.2d 582, 584 (1949), a witness testified that the defendant had a good reputation for being a *peaceful, law-abiding* citizen, and that he also had a good reputation for being a *truthful, honest* person. Still other cases seem to draw a distinction among: (1) reputation for *truth (and veracity)*; (2) *honesty and fair dealing*; and (3) *peacefulness and law-abiding*. In *Jones v. State*, 159 Tex.Crim. 18, 261 S.W.2d 324, *cert. denied*, 346 U.S. 859, 74 S.Ct. 75, 98 L.Ed. 372 (1953), the court held that the defendant's reputation for truthfulness was not admissible because that reputation had not been attacked nor had contradictory statements been made. The defendant's reputation evidence for *honesty and fair dealing* was not admissible especially in view of the fact that the defendant was permitted to prove his reputation for being *peaceable and law-abiding*. Thus, finding little help from the case law, we shall do an independent analysis based on the record before us.

■ Truthful means "telling the truth; presenting the facts; veracious; honest." WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 1028 (1971). Honest is defined as "that will not lie, cheat, or steal; truthful; trustworthy." *Id.* at 871. Based on these definitions, we conclude that the term honesty is a broader term than truthfulness. It follows, then, that one who is honest must also be truthful because honesty subsumes truthfulness. Because truthfulness is but one of the components of honesty, the converse is not necessarily so; thus, one may be truthful but not be honest. With that in mind, we turn now to the record before us.

Our objective evaluation of that record leads us to the conclusion that all the participants in the trial considered *truth and veracity* and *honesty* to be distinct character traits. Our conclusion is based on the following: (1) Mrs. Wiggins's testimony that the "have you heard" testimony changed her opinion as to her son's honesty, but not as to his truth and veracity; (2) the State's failure to question Mrs. Wiggins before the jury about truthfulness, but its choice instead to limit its cross-examination of her to honesty; (3) the State's failure to attempt to use the "have you heard" testimony to test the opinion of several other witnesses who testified only as to Wiggins's truthfulness; (4) defense

on policy reasons, it prospectively modified its interpretation of rule 608(b), as expressed in *Gustafson v. State*, 267 Ark. 278, 590 S.W.2d 853 (1979), to limit the inquiry on cross-examination to specific instances of misconduct clearly probative of truthfulness or untruthfulness as distinguished from conduct probative of dishonesty.

counsel's cross-examination of one of the State's character witnesses, Mark Sconce, a co-owner of the Nancy Bounds School in Omaha, as well as defense counsel's argument to the trial court challenging Sconce's testimony on the grounds that it was based on matters that went to *honesty,* not to *truthfulness;*[4] and, perhaps most significantly, (5) the trial court's comments outside the presence of the jury that "I don't think there is any question, if a witness testifies particularly on *truth and veracity,* that's the extent of the State's cross-examination on that. I'm going to anticipate that you're going to say that the character trait for *honesty* was opened up."

It is undisputed that the defense intended to, and did, introduce Mrs. Wiggins's testimony as evidence of her son's good character for truthfulness. Evidence of good character for truthfulness is not admissible until the witness's character as to truthfulness has been attacked. TEX.R. CRIM.EVID. 608. Mindful that answers, not questions, constitute evidence, what is less clear from the record is whether Mrs. Wiggins intended to tell the jury that her son was also *honest.* She first answered that her son was an honest person; later, upon being asked the "have you heard" questions, she changed her opinion as to *honesty,* but she did not change her opinion as to *truthfulness.* For the reasons earlier set out, however, we need not decide whether the "have you heard" testimony was admissible to test the witness's opinion as to truthfulness; we need only decide whether it was properly admitted to test the witness's opinion of Wiggins's honesty.

Second, Wiggins argues that the "have you heard" questions were improper because Mrs. Wiggins's testimony on direct examination was in the form of opinion testimony rather than reputation testimony and, thus "have you heard" testimony was not proper evidence with which to test the

witness's opinion. The State counters by saying that Wiggins did not specifically so object at trial; therefore, any error on that basis is waived. Wiggins points to the following portion of a long objection as preserving the point: "[I]t would be blatantly unfair and it would cause the jury to see evidence and have-you-heard things that do not test the testimony that has been presented before the jury."

We conclude that, in substance, Wiggins's objection was that the proffered testimony was not *relevant* for the purpose of testing Mrs. Wiggins's opinion. Only *relevant* specific instances of conduct are admissible under rule 405(a).

Finally, Wiggins argues that his mother's testimony was inadmissible under rule 608(a) of the Texas Rules of Criminal Evidence because: (1) it was not limited to truthfulness, and (2) Wiggins's character for truthfulness had not been attacked. Mrs. Wiggins testified that: she was Wiggins's mother; she had lived in Omaha, Nebraska for twelve years; Wiggins had lived in her household predominantly all of his life; she and Wiggins's natural father were divorced; Wiggins was twenty-four years old; she had maintained contact with him after he left her home to go to Texas for a modeling job; she knew what he was charged with in this case; and that she was down here because she was his mother and that she loved him. No other basis for her opinion was established.

Although the State argues that the specific acts were inconsistent with the character trait of truthfulness, it never tested the witness's opinion as to Wiggins's *truthfulness* by use of such testimony before the jury; it simply tested her opinion as to *honesty.* Therefore, based on the record before us, we conclude that the admission of the "have you heard" testimony was

---

**4.** That, in the minds of some, a fine line distinction exists between the concept of honesty and the concept of truthfulness is reflected in the following exchange on cross-examination of Sconce by defense counsel: "Q. Your testimony really has to do with what you perceive his reputation for being an honest person is, is it not, rather than a truthful [sic]? A: I have difficulty separating in my mind the concept of honesty from the concept of truthfulness." Later, in response to a question from the court as to whether he understood the question, Sconce replied, "I'm not sure I do, Your Honor. I've always considered honesty and truthfulness to be synonymous."

allowed to test the *honesty* answer of Mrs. Wiggins, not to test her *truthfulness* answer; consequently, we need not decide whether the testimony admitted was inconsistent with the character trait of *truthfulness*.

The standard for determining whether the trial court erred in admitting evidence is an abuse of discretion standard. *See e.g., West v. State,* 720 S.W.2d 511, 519 (Tex.Crim.App.1986), *cert. denied,* 481 U.S. 1072, 107 S.Ct. 2470, 95 L.Ed.2d 878 (1987). In determining whether the trial court abused its discretion in allowing the testimony to test Mrs. Wiggins's opinion of her son's *honesty,* we must make four determinations.

■ First, we must determine whether the evidence supports a conclusion by the trial court that Mrs. Wiggins's answer was a "deliberate attempt" to create a false impression before the jury. *Prescott v. State,* 744 S.W.2d 128, 131 (Tex.Crim.App. 1988). Second, we must determine whether the nonresponsive answer was admissible or inadmissible, in order to enable us to make the third determination as to whether the State's remedy to counter the response "Michael is an honest person" was an objection and request to strike the answer with an instruction to disregard, or whether it was a right to test the witness's knowledge by use of the "have you heards." If we determine that the non-responsive answer was also inadmissible, thus the State's remedy was an objection, motion to strike and an instruction to disregard, *see Smith v. State,* 763 S.W.2d 836, 841 (Tex.App.—Dallas 1988, pet. ref'd),[5] we need not reach the fourth determination as to the relevancy of the admitted testimony to test the stated opinion. However, a determination that the *honesty* evidence

was admissible necessarily requires a fourth determination of whether the specific "have you heard" testimony was *relevant* to test the stated opinion.

### A "deliberate attempt"

Relying on *Prescott,* 744 S.W.2d at 133, Wiggins argues that because Mrs. Wiggins's testimony was inadmissible under rule 608(a) of the Texas Rules of Criminal Evidence, the door was not opened for the State to impeach with "have you heard" testimony. In *Prescott,* the witness's response was ambiguous and the Court of Criminal Appeals concluded that, when examined in the context in which the answer was given, the answer was not a "deliberate attempt" to create a false impression. Wiggins argues that the same is true here—that Mrs. Wiggins's response was not a deliberate attempt to portray the appellant as something more than just truthful. Unlike *Prescott,* however, here the witness's answer was not ambiguous. Mrs. Wiggins clearly stated to the jury that her son was an honest person. Moreover, she did so after having heard about the burglary, receiving and concealing stolen property, and unauthorized use offenses. Further, she later testified that the "have you heard" testimony about the stolen money, shoes, and clothes would have changed her opinion as to his honesty, but *not* as to his truthfulness. We conclude, therefore, that the above reflects that, at least to Mrs. Wiggins, honesty is not the same as truthfulness; and, we further conclude that her answer was not ambiguous.

■ It is well settled that credibility is a matter exclusively for the trial court. *See Bonham v. State,* 680 S.W.2d 815, 819 (Tex.Crim.App.1984), *cert. denied,* 474 U.S.

---

5. We are aware of the recent opinion in *Murphy v. State,* 777 S.W.2d 44, 67 (Tex. Crim. App. 1989) wherein that Court, speaking through Judge Clinton, stated: "At its option, however, the opponent of such evidence may forgo [sic] objection with a view to eliciting other evidence of specific conduct to rebut it. By tendering the evidence in the first instance the proponent has in effect consented to admission of specific acts of conduct...." We find that case factually distinguishable from the situation here which

occurred during the guilt-innocence phase and resulted from a non-responsive answer. Thus, we have adhered to the reasoning of earlier cases which reflect a "paramount concern ... to avoid undue prejudice infecting the determination of guilt or innocence", *see Murphy,* at 68, in holding that the State's remedy was an objection and motions to strike and instruct the jury to disregard. *See also Nixon,* 653 S.W.2d at 444. *See* p. 892 *infra.*

865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). We conclude, therefore, that the intent of Mrs. Wiggins to create a false impression with the jury was a matter to be determined objectively by the trial court, within its discretion, based on the specific facts before it. Thus, we conclude that *Prescott* is distinguishable on its facts from this case, and further conclude that the evidence is sufficient to support a conclusion by the trial court that Mrs. Wiggins's answer was a "deliberate attempt" to create a false impression before the jury.

*Admissible vs. Inadmissible*

*and*

*The State's Remedy*

Wiggins argues that Mrs. Wiggins's testimony was inadmissible under rule 608(a), which expressly governs the admissibility of evidence of character for truthfulness, because Wiggins's truthfulness had not been attacked by the State, and, further, because it was not limited to truthfulness. Consequently, he argues, the State's remedy was an objection, motion to strike, and instruction to the jury to disregard. Wiggins argues that by failing to object to inadmissible evidence, the State was precluded from rebutting that testimony. The State, on the other hand, argues that Mrs. Wiggins's testimony that her son was an honest person was admissible, not under rule 608(a) but, rather, under rule 405(a) as evidence of a particular character trait of Wiggins; thus, it argues that its remedy was to test her opinion by use of the "have you heards."

Rule 405 states:

(a) Reputation or Opinion. In all cases in which evidence of character or trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. Provided however that in order to be competent to testify concerning the character or trait of character of the accused, a witness must, prior to the date of the offense, have been substantially familiar with the *reputation* of the ac-

cused. In all cases where testimony is admitted under this rule, on cross-examination inquiry is allowable into *relevant* specific instances of conduct.

(b) Specific Instances of Conduct. In cases in which character or trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

TEX.R.CRIM.EVID. 405 (emphasis added).

Rule 608 states:

(a) Opinion and Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(b) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence.

TEX.R.CRIM.EVID. 608.

■ Mrs. Wiggins was called as a character witness on the guilt-innocence stage to testify to Wiggins's good character for truthfulness. At the time she was questioned, Wiggins's character for truthfulness had not been attacked; therefore, her testimony was inadmissible. At that time, the State should have objected and requested the court to strike the answer and instruct the jury to disregard; however, the State did not object to this testimony. "[Y]et, when such improper evidence is admitted, the State may not under the guise of rebuttal present additional improper evidence." *Nixon v. State*, 653 S.W.2d 443, 444 (Tex.Crim.App.1983); *quoting White v. State*, 590 S.W.2d 936,

937 (Tex.Crim.App. [Panel Op.] 1979).[6]

 Regarding the State's argument that good character evidence of *honesty* was admissible under rule 405(a), we disagree. To the extent that good character evidence of *honesty* expressed good character evidence of *truthfulness*, pursuant to rule 608(a), it was inadmissible because Wiggins's character for truthfulness had not been attacked by the State, nor had his testimony been impeached with contradictory statements. The fact that the complainant's testimony offered by the State disputed Wiggins's testimony does not of itself create an attack on his general reputation for truthfulness warranting the admission of character testimony. *See Spector v. State*, 746 S.W.2d 946, 951 (Tex.App. —Austin 1988, pet. ref'd), *citing Wallace v. State*, 501 S.W.2d 883, 886 (Tex.Crim.App. 1973). *See also Clay v. State*, 78 Tex. Crim. 141, 180 S.W. 277 (1915).

To the extent it expressed good character evidence of character traits broader than truthfulness, it was inadmissible under rule 404(a)(1) of the Texas Rules of Criminal Evidence, which governs the admissibility of character evidence to prove conduct.[7] That rule states:

> Evidence of a person's character or a trait of character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, *except:*
>
> (1) *Character of accused.* Evidence of a *pertinent trait* of his character offered by an accused, or by the prosecution to rebut the same.

TEX.R.CRIM.EVID. 404(a)(1) (emphasis added).

 A *pertinent trait* is "one that relates to a trait involved in the offense charged or a defense raised." *See Spector,* 746 S.W.2d at 950, *citing* 2 RAY, TEXAS LAW OF EVIDENCE § 1492 (Texas Practice 3d ed. 1980). Unless evidence of the trait of honesty is pertinent to the charge of aggravated sexual assault, rule 404 forbids its introduction as circumstantial evidence of innocence of that offense. *Cf. Cockrell v. State*, 131 Tex.Crim. 3, 95 S.W.2d 408, 409 (1936) (conviction for *robbery* reversed because the trial court excluded evidence of good character for honesty; the court specifically stated, however, that the character trait of honesty was involved in the robbery offense). We conclude that here, unlike *Cockrell*, the character trait of honesty is not involved in the offense of aggravated sexual assault. Consequently, we conclude that it was inadmissible evidence to which the State should have objected at the time it came into evidence. By not so objecting, we conclude that the State was precluded from then rebutting that inadmissible evidence with further inadmissible evidence. *See White*, 590 S.W.2d at 937.

### *Relevancy*

 Wiggins argues that rule 405 does not alter the reasoning of a line of cases beginning with *Ward v. State*, 591 S.W.2d 810, 818 (Tex.Crim.App.1979), and recently reaffirmed in *Rutledge v. State*, 749 S.W.2d 50, 53 (Tex.Crim.App.1988) that "a witness who has not professed to be familiar with [a defendant's] reputation in the community could not logically be discredited by questions of whether he has heard other rumors of acts inconsistent with that reputation." The State, on the other hand, argues that rule 405, by now allowing opinion evidence, has rendered that line of cases inapplicable. In response to questions at oral argument concerning the "substantial familiar[ity] with the *reputation* of the accused" proviso of rule 405(a), the State responded that the proviso

---

**6.** If the State knew that it later intended to put on character evidence of Wiggins's untruthfulness, which would then render Mrs. Wiggins's good character evidence admissible, *cf. Jones v. State*, 587 S.W.2d 115, 120 (Tex.Crim.App.1979) (op. on reh'g), it should have stated into the record that, although the evidence was at that time inadmissible, the State would waive its objection because the testimony would later be

rendered admissible by the State's anticipated rebuttal evidence. The record before us does not reflect such a waiver.

**7.** Rule 608 appears to simply be a specific exception to the general rule set out in rule 404(a). *See* Advisory Committee Notes to FED.R.EVID. 608.

language should not be literally construed as a predicate for an opinion under that rule. *Citing* 33 GOODE, WELLBORN AND SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 405.2 (Texas Practice 1988), the State argued that the proviso was included in rule 405(a) because of concerns regarding the common practice of having peace officers testify at the punishment phase concerning the defendant's bad reputation; consequently, there is no good reason to interpret the rule as requiring such a predicate. The State's position, of course, would require us to totally ignore the word "reputation" contained in the proviso. However, because of our conclusion that the proper State's remedy was to object, move to strike, and request to have the jury disregard, we need not determine whether the admitted evidence was relevant to test the stated opinion.[8] It should be remembered that the purpose of permitting cross-examination by the use of "have you heard" testimony is not to discredit the person on whose behalf the witness is testifying, but rather, the purpose is to affect the weight of the *testifying* witness's testimony. *See generally Evans v. State,* 757 S.W.2d 759, 766 (Tex.Crim.App.1988) (Teague, J., dissenting and concurring). Accordingly, we hold that the admission of the "have you heard" testimony was error.

■ However, this does not end our inquiry. Having determined that the admission of "have you heard" testimony was error, we must now determine whether Wiggins was harmed by the error. We are mandated by rule 81 of the Texas Rules of Appellate Procedure that "the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." TEX.R.APP.P. 81(b)(2). We must therefore, determine whether the error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967);

*Green v. State,* 727 S.W.2d 263, 267 (Tex. Crim.App.1987). In making that determination, we first consider whether the trial court gave a limiting instruction. *Cf. Prescott v. State,* 744 S.W.2d at 133 (failure to give limiting instruction considered in assessing harm). Unlike in *Prescott,* the trial court here gave a limiting instruction, which limited the use of the "have you heard" evidence to "testing (if it [did]) the knowledge of such witnesses as to the defendant's reputation and the weight to be given to their testimony." Indeed, the jury was instructed not to consider the evidence for any other purpose. The jury is presumed to have followed the court's instruction. *Rose v. State,* 752 S.W.2d 529, 554 (Tex.Crim.App.1987) (op. on reh'g). In addition to the limiting instruction, we also consider the additional bad character witnesses presented by the State on rebuttal. Patrick Badie, a former owner of Back Stage Limited Shoe Store in Omaha; Mark Sconce, a co-owner of the Nancy Bounds Finishing and Modeling School in Omaha; and Wally Jernigan, a 19–year veteran detective of the Omaha police department assigned to the homicide and assault division, all testified that Wiggins had a bad reputation in the community for truth and veracity. In light of the record as a whole, the presumption that the jury obeyed the trial court's instruction, and the additional bad character evidence presented by the State, we conclude beyond a reasonable doubt that the error in allowing the "have you heard" testimony of Mrs. Wiggins made no contribution to the conviction or to the punishment. *Id.* We overrule appellant's second point of error.

### *Failure to Instruct to Disregard*

■ In his third point of error, Wiggins claims that the trial court erred in denying his request to instruct the jury to disregard Mrs. Wiggins's nonresponsive answer regarding her son's honesty. However, at trial, Wiggins's attorney did not object or make a request to disregard until after he had finished his direct examination

---

8. This Court, has, however, previously applied the rationale of *Rutledge,* 749 S.W.2d at 53, to the specific facts of a post-rule 405 case where a

fact witness had testified based on his personal knowledge. *See Smith,* 763 S.W.2d at 845.

and passed the witness. Inherent in whether evidence is improperly allowed before a jury is the element of whether a proper and timely objection is lodged against that evidence. *Smith*, 763 S.W.2d at 841. When there is a nonresponsive answer, the objection may be lodged after the answer has been made, but it must be lodged in a timely manner. *See id.* If the objection is not made as soon as the basis for the objection becomes apparent, any error is waived. *See Miller v. State*, 741 S.W.2d 382, 391 (Tex.Crim.App.1987); *Thompson v. State*, 691 S.W.2d 627, 635 (Tex.Crim.App.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985).

 In *Clay*, the defense did not request withdrawal of inadmissible evidence until the charging stage of the trial. *Clay*, 180 S.W. at 278. In reversing, the Court of Criminal Appeals stated:

It is sometimes a close question as to the withdrawal of testimony illegally admitted, but whenever that testimony is illegal and material, or is calculated to affect the trial of the case injuriously to defendant, then the testimony, although withdrawn, cannot cure the error. But here the court positively refused to withdraw it. It is sometimes also a close question with reference to the withdrawal of testimony at the stage of the trial when the motion is made, but whatever that may be, or whenever it may occur, if the testimony is illegal and material, or likely to have a material bearing upon the case, it may be withdrawn, and it is error not to withdraw it even when requested in a charge.

*Id.* For the reasons earlier stated, we conclude that in the context of this case, the good character testimony for honesty expressed by Wiggins's mother was neither material nor "calculated to affect the trial of the case injuriously to defendant;" thus, unlike in *Clay*, we conclude that it was not error for the trial court to refuse *defense counsel's* motion to withdraw the testimony.[9] The error of the trial court was not in failing to withdraw the evidence, but, rather, it was in allowing the State to test the witness's opinion as to honesty because that evidence was inadmissible; thus, the State's remedy was an objection, a request of the court to strike the answer, and an instruction to the jury to disregard. Thus, we overrule Wiggins's third point.

### Scope of Cross–Examination

 In points of error four and five, Wiggins asserts that the trial court erred in allowing the State to cross-examine Wiggins about being fired from jobs at Back Stage Limited and Happy Hollow Country Club. We disagree. In Texas courts, cross-examination is not limited to the scope of direct examination. *Arnold v. State*, 679 S.W.2d 156, 159 n. 1 (Tex.App.—Dallas 1984, pet. ref'd). Generally, the scope of cross-examination is within the discretion of the trial court. *Castle v. State*, 748 S.W.2d 230, 233 (Tex.Crim.App. 1988); *Reyes v. State*, 741 S.W.2d 414, 421 (Tex.Crim.App.1987). However, where the defense counsel delves into a matter on direct examination, the State is free to fully develop the same subject matter on cross-examination. *See Pyeatt v. State*, 462 S.W.2d 952, 953 (Tex.Crim.App.1971); *Pierce v. State*, 160 Tex.Crim. 587, 272 S.W.2d 736, 738 (1954); *Elizondo v. State*, 665 S.W.2d 205, 207 (Tex.App.—San Antonio 1984, no pet.); *Waldrop v. State*, 662 S.W.2d 612, 615 (Tex.App.—Houston [14th Dist.] 1983, pet. ref'd). During direct examination, Wiggins testified extensively about his prior work history. Consequently, he opened the door for cross-examination on that subject. We overrule Wiggins's fourth and fifth points of error.

 In his sixth and seventh points of error, Wiggins complains that the trial court erred in overruling his objection to the charge on punishment because it failed to include two potential conditions of probation. Specifically, Wiggins asked the trial court to include in the charge the possible

---

9. The honesty answer was damaging not to Wiggins, but to the State. Therefore, a different conclusion would likely have been reached had the trial court refused to strike the answer and instruct the jury to disregard it, in the face of a timely and specific objection by the *State*, and the issue being properly raised on appeal. That issue, however, is not before us in this case.

probation conditions of psychological counseling and incarceration for up to 120 days. Assuming, without deciding, that the trial court erred in failing to include these two terms in its instruction to the jury, we hold that the error was harmless.

The trial court instructed the jury as follows:

You are further instructed that in the event the defendant is placed on probation, the conditions of probation may include but shall not be limited to the conditions that the probationer shall:

(a) Commit no offense against the laws of this State or of any other State or of the United States;

(b) Avoid injurious or vicious habits;

(c) Avoid persons or places of disreputable or harmful character;

(d) Report to the probation officer as directed, to-wit: monthly;

(e) Permit the probation officer to visit him at his home or elsewhere;

(f) Work faithfully at suitable employment as far as possible;

(g) Remain within a specified place, to-wit: Dallas County, Texas;

(h) Pay his fine, if one be assessed, and all court costs whether a fine be assessed or not, in one or several sums, and make restitution or reparation in any sum that the court shall determine;

(i) Support his dependents;

(j) Reimburse the county in which the prosecution was instituted for compensation paid to appointed counsel for defending him if counsel was appointed; and participate in any community-based program;

(k) Remain under custodial supervision in a community-based facility, obey all rules and regulations of such facility, and pay a percentage of his income to the facility for room and board;

(l) Pay a percentage of his income to his dependents for their support while under custodial suspension in a community-based facility; and

(m) Pay a percentage of his income to the victim of the offense, if any, to compensate the victim for any property damage or medical expenses sustained by the victim as a direct result of the commission of the offense.

In addition, the probationer shall pay a probation fee not exceeding $40.00 per month to the probation officer of this court on or before a specified day of each month during probation.

In addition to this long list of possible probation conditions, Wiggins's attorney informed the jury during his closing argument that conditions of the defendant's probation could also consist of psychological counseling and 120 days of confinement. Specifically, Mr. Wiggins's attorney made the following comments to the jury:

The parents are good people. He has got a mother and a dad, a stepmother, and the other people that have come down here out of love for their son and their friend. I think you can see that they will do what they can to see that whatever conditions of probation that Judge McDowell sees fit to assess, it will be done. If it is psychological and psychiatric treatment every single day on a ten-year probated sentence, it will be done. If it isn't, I know Judge McDowell and I know that he is a man of his word. I know that he is a fine Judge. If he places a condition on probation that is not fulfilled, he will have a hearing and he do [sic] what he thinks is right. He's been a judge for a long time.

Members of the jury, I beg you to please give Mike Wiggins an opportunity by your verdict—you obviously have found that he has done something terrible. It is something that must need psychological or psychiatric attention. Won't you give him the opportunity to get it? If the court sees fit, that will be a condition.

. . . .

If the Court wants to, it can send him to the penitentiary for up to a hundred and twenty days as a condition of probation before he ever starts to serve it. The Court can require any kind of evaluation. The Court can require any kind of treatment that is necessary. The Court will monitor this case.

Giving him probation is not just slapping his wrist and sending him out on the street. It is something that this fine Judge can monitor. I assure [sic] that this fine Judge does his job.

Although the trial court failed to include the possible probationary terms of psychological counseling and up to 120 days of confinement in its instruction to the jury, the trial court did allow Wiggins's attorney to elaborate at length on those two possible terms of probation. Consequently, we hold that any error in failing to include those terms in the charge to the jury was harmless beyond a reasonable doubt. *See* TEX. R.APP.P. 81(b)(2). We overrule Wiggins's sixth and seventh points of error.

Accordingly, we affirm.