COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| DAMACIO SANDOVAL, JR. | § | No. 08-23-00232-CR |
| Appellant, | § | Appeal from the |
| v. | § | 198th Judicial District Court |
| THE STATE OF TEXAS, | § | of Kerr County, Texas |
| Appellee. | § | (TC# B21-473) |

## MEMORANDUM OPINION[1]

A jury found Appellant Damacio Sandoval, Jr. guilty of aggravated assault with a deadly weapon and assessed punishment at ten years' confinement. In a single issue on appeal, Appellant asserts the trial court erred by admitting testimony about prior extraneous offenses involving domestic violence. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Because Appellant does not raise an issue challenging the sufficiency of the evidence to support his conviction, we only briefly discuss the background of the evening on which Appellant committed the offense of aggravated assault with a deadly weapon against Braxton Mathson. *See*

---

[1] The appeal was transferred to this Court from the Fourth Court of Appeals pursuant to a Texas Supreme Court docket equalization order. Accordingly, we apply the Fourth Court of Appeals' precedent to the extent it conflicts with our own. *See* Tex. R. App. P. 41.3.

Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). On the same evening as the assault, Appellant also shot and killed Patrick Louvier.[2] Because the background of that offense is relevant to Appellant's issue in this appeal, we also briefly discuss the events that led to the shooting.

At trial, several witnesses testified about the evening on which Appellant shot Louvier and threatened Mathson with a gun. A large group of family and friends was gathered at the home of Appellant's mother-in-law, Cynthia Vlasek, to celebrate a family member's life the day before his funeral. A guest, Courtney Garrison, testified that she was sitting outside on the porch with Appellant, Appellant's common-law wife (Cara Westrum), Louvier, and Louvier's girlfriend (Amanda).[3] According to Garrison, Westrum had a black eye and busted blood vessel, but she did not talk to Westrum about the injury. Garrison testified that Amanda said to Westrum, "Hey, do you remember that weekend that you came down here and we got fucked up and we partied at my house?" Garrison said Appellant then "stood up from the table and his complete demeanor changed. . . . [A]nd as soon as that was said, he clearly got very angry." Garrison stated Amanda and Louvier started to leave after being asked to do so by Vlasek, but Appellant "kept taunting them, saying inappropriate things, trying to get a rise out of him" as Louvier was walking toward his car.

Two other guests, Johnny Tisdale and Mathson, testified that they heard yelling and arguing just before the shooting. Tisdale said he heard Appellant tell Louvier to leave in a

---

[2] The murder and aggravated assault charges were tried together before the same jury. Appellant was convicted of the murder of Louvier and appealed that conviction in a separate companion appeal labeled cause number 08-23-000231-CR.

[3] Amanda, whose full name is not identified in the record, did not testify at trial.

2

derogatory manner, then he saw Louvier swing around the table toward Appellant, and Appellant pulled out a gun and started to shoot Louvier. By the time law enforcement arrived, Louvier was deceased on the ground with multiple gunshot wounds.[4]

Mathson testified that on the day of the shooting, he and another man were working on a handrail on some stairs for an elderly relative who also lived on the property. When he heard six or seven gunshots, he ran to the porch of Vlasek's house to check on his wife and several children who were in the area. As he ran towards the porch, he saw Appellant holding a gun. Mathson said Appellant "turned, pulled a gun on me, [pointed the gun directly at me], [and] told me to get the fuck back, so I put my hands in the air." He said he and Appellant were about 20 to 30 feet apart, and he feared for his life. As he held his hands up, he started "walking back slowly, because [I was] not there to cause any harm." He said he only wanted to ensure his family was okay. When Mathson saw Appellant get into a car and drive away, Mathson went to find his family. After he determined everyone was safe and his wife was calling 911, Mathson went back outside. As he walked out onto the porch, he saw Appellant. Mathson testified that Appellant came running around the corner and he "had the gun pulled on me and again says, Get the fuck out, again."

Appellant and Westrum both testified for the defense and Appellant asked for and received instructions on self-defense and defense of another in the jury charge. Westrum testified that Appellant and Louvier had never met before the evening of the shooting. She said she went and drank with Amanda and Louvier when she left Georgetown to visit with her mother and stayed with Amanda and Louvier for a week following an argument and break-up with Appellant. Westrum said that the evening of the shooting, Amanda said to her, "Hey, remember that time we

---

[4] The medical examiner testified to eight gunshot wounds.

were drinking together at my house?" Westrum was upset because she had not told Appellant about the time she spent with Amanda and Louvier.

Westrum said Appellant and Louvier argued and Louvier told her and Appellant "he had a gun and was going to pull it out and kill us both, me and [Appellant]." She said that after she asked her mother to ask Amanda and Louvier to leave, she went back outside where Louvier and Appellant were exchanging "cuss words." She said Louvier was walking away a little bit with Amanda then turned back around and knocked her to the ground where she hit her face. When the police arrived, Westrum told them Appellant acted in self-defense and to protect her.

When Appellant was asked about what led to him shooting Louvier, Appellant testified that they were sitting around and he was talking to his wife's cousin when Amanda interrupted them, referencing a time "when we were getting fucked up." After being asked who Amanda was referring to, Appellant testified as follows:

A. I would have to say [Westrum], because shortly after that, she . . . looked upset and she walked inside [Vlasek's house].

Q. And then what happened when [Westrum] looked upset and was walking inside?

A. I heard–I heard somebody yell, "Why are you acting like a little bitch?"

Q. And who did that?

A. [Louvier].

Q. And when he said that, what did you do?

A. I looked at him.

Q. And then what did he say?

A. He said "What's up, mother fucker? I got my gun on me. I keep it on me since my brother was killed."

4

Appellant explained he then walked away and went to Westrum's vehicle to retrieve his own gun because he "had just been threatened with a gun" and he did not feel safe. Appellant said he had never met Louvier before that night.

According to Appellant, Louvier was told to leave the gathering and when he refused, he and Appellant started to argue over him leaving, yelling at each other in a derogatory manner. At some point during the argument, Appellant, who was facing away from Westrum, said he did not know whether Louvier hit Westrum or pushed her; he just heard "her hit the ground." Appellant said he turned around, saw Westrum on the ground, and then shot Louvier several times.

When asked about his interaction with Mathson after he shot Louvier, Appellant testified he first went into the house to ensure Westrum was safe.

A. So, I was telling her to go inside, and I wanted her to go inside to check up on our daughter.

Q. Okay. Then what happened?

A. I turned around, and there was somebody right on me and–

Q. Who was that somebody right on you?

A. At the time, I didn't know. I thought it was [Louvier]. . . . But from everything that was said, it was [Mathson].

Q. Okay. And when you said someone was right on you, what did you think or how did you feel?

A. I just didn't want to–I just didn't want to, like, get, like–like, attacked or, like, get jumped on or anything, because I still have the firearm in my hand. So, I just yelled at him to, "Back the fuck up."

.         .         .

Q. So, tell me what happened. Show me what happened.

A. Well, I was facing this way, and I still had my gun in my hand. And I turned, and I was, like, "Back the fuck up," and I seen [sic] him raise his hands.

5

．　　　．　　　．

Q What did he do?

A. He put his hands–

．　　　．　　　．

Q. Then he walked back?

A. He took one step back, turned around, and took off.

Q. Okay. What was your intent? You can go ahead and lower–

A. My intent?

Q. Yeah. What was the purpose to do that? Were you trying to kill him, hurt him? Tell me.

A. No. I had been threatened with a gun, and my thing is I'm not a–

Q. Go ahead and sit down. Were you scared?

A. I was still scared, yes, ma'am.

Appellant said he thought Mathson was going to get a rifle based on the way Mathson "took off running." He denied encountering Mathson a second time. Appellant was arrested at the scene and charged with aggravated assault with a deadly weapon and the murder of Louvier.

## TESTIMONY ABOUT THE EXTRANEOUS OFFENSES

On appeal, Appellant complains about the admission of two extraneous offenses into evidence: (1) Westrum's telephone call to Vlasek in May 2020 regarding Appellant trying to smother Westrum with a pillow; and (2) an offense in October 2020 that "involved an unspecified alleged assault committed by [Appellant] against" Westrum.[5]

---

[5] On appeal, the State contends Appellant "properly preserved" his Rule 404(b) complaint, but then contends he waived "the issue" by not requesting a limiting instruction. The State does not identify the waived "issue." We believe the State refers to Rule of Evidence 105, which provides that when a "court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on request, must restrict the evidence to its proper scope and instruct the jury accordingly." Tex. R. Evid. 105(a). "A party may claim error in a

6

Because the State intended to introduce the May 2020 extraneous offense through Vlasek's testimony, defense counsel requested a hearing outside the jury's presence prior to her testifying. The State argued that the testimony about the May 2020 offense was the "entire pretext" for why the shooting happened and was relevant to Appellant's motive, intent, and lack of mistake as well as to rebut Appellant's defensive theories. The State also wanted to introduce an October 2020 incident of domestic abuse.[6] Defense counsel objected that the testimony was prohibited because the State was trying to show Appellant was a violent person. The trial court indicated it would allow testimony about both extraneous offenses.

### A. Vlasek's testimony about the May 2020 extraneous offense

Vlasek testified that about a year before the shooting, she received a telephone call from her daughter, during which Westrum said, "Mom, I left him." "He tried to kill me. He put a pillow over my face, tried to suffocate me. I had to kick him in the groin to get him off."[7] According to Vlasek, Westrum stayed with her for a time after that call and also stayed with Louvier and Amanda, who was around the same age as Westrum. Ultimately, after about a week, Westrum went back to Appellant.

A year later, on the night of the shooting, Vlasek, who was hosting the family gathering, was inside her house when Westrum came in upset. Vlasek testified,

---

ruling to admit evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—only if the party requests the court to restrict the evidence to its proper scope and instruct the jury accordingly." *Id.* at 105(b)(1). At trial, Appellant did not ask the court to limit the jury's consideration of the extraneous-offense evidence to determining whether he acted in self-defense or in defense of another on the murder charge. However, on appeal, Appellant does not argue that extraneous-offense evidence should have been admitted only for a limited purpose, and he does not raise an "issue" on appeal that the trial court erred by not giving a limiting instruction when the extraneous-offense evidence was first offered.

[6] The State initially wanted to introduce this extraneous offense through Mathson's testimony, but the trial court did not allow it. Later, the trial court allowed the State to question Westrum about the alleged incident.

[7] When Westrum testified for the defense, she denied Appellant tried to smother her with a pillow.

7

I had walked into the kitchen from outside and [Westrum] said, "Mom, mom, mom, come here." And she was upset. She was shaking, voice was trembling. She said, "Amanda and [Louvier] brought up the time I spent with them and [Appellant] didn't know about it, and now he is angry and I'm scared. He's pissed, and I'm scared. He is going to kill me. He is going to make me and [our daughter] leave and he is going to kill me," is what she said.

Westrum asked Vlasek to ask Louvier and Amanda to leave. Vlasek then described her conversation with Amanda:

I called for Amanda to come in the house and took her in the back, in my room, and I spoke to her privately and said, "You know, Cara asked you not to talk about that week. You know how angry he can get." And she said, "Well, I forgot." And she said, "What should we do? Should we leave?" . . . By the time we walked back out on the patio, [Appellant] was still angry. . . . And so I said, "Yeah, y'all better go ahead and leave." So, they proceeded to go to their car. . . . [Appellant was] walking around, not saying much to everybody else. He was aggravating [Louvier], making rude comments to him.

### B.      Westrum's testimony about an alleged October 2020 incident

Appellant called Westrum as a defense witness, and during her cross-examination, the State attempted to elicit testimony about an incident in October 2020:

Q.   Now, in October of 2020, it's been testified to that you moved–you and [your daughter] moved in with Addie and Mathson into their house in Georgetown; isn't that correct?

A.   No.

Q.   And, in fact, the reason why you moved in from there is because [Appellant] had strangled you and tried to kill you, and they allowed for you to immediately move, you and [your daughter], into their house; isn't that correct?

A.    No.

Q.   And from there, that same night that y'all moved in, . . . you were going to leave . . . your daughter, with them to go to a Halloween party with [Appellant], the same man that had just strangled you; isn't that correct?

A.   We did go to a Halloween party, but he did not strangle me.

8

Q.   And, in fact–in fact, when [Mathson] found out that you were going to return to [Appellant] that same night and dump your daughter with them, that he told you—

.   .   .

Q.   He told you, "If you go to that party, pack your bags and take [your daughter], because you are not going to live here. I'm not going to enable you to live with this abusive relationship anymore;" isn't that correct?

A.   I do not recall.

Q.   You don't recall?

A.   No.

Q.   So, if Braxton testified to that, he would be a liar?

A.   I don't know. You should ask him.

Q.   I did ask him, and that was his answer.[8]

A.   I don't remember.

## DISCUSSION

On appeal, Appellant asserts evidence of the extraneous offenses was improperly admitted for the sole purpose of showing character conformity in violation of Texas Rule of Evidence 404(b), and the probative value of the evidence was outweighed by its inflammatory or prejudicial effect. Before the trial court, the State argued the extraneous-offense testimony went to Appellant's motive, intent, and lack of mistake. On appeal, the State asserts the intentional violence Appellant exhibited in May 2020 was the same intentional violence that caused him to point a gun at Mathson.

---

[8] Our review of Mathson's testimony before the jury reveals the State never asked Mathson anything more than whether Westrum stayed with him and his wife. Mathson said she stayed for only one day in October 2020. He did not elaborate on why Westrum stayed at his home or testify about any conversation he had with Westrum.

9

## A.    Applicable law

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at 404(b)(2); *see also Lemmons v. State*, 75 S.W.3d 513, 523 (Tex. App.—San Antonio 2002, pet. ref'd). "Extraneous offense evidence that logically serves any of these purposes is relevant beyond its tendency to prove the character of a person to show that he acted in conformity therewith." *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990) (en banc). In other words, evidence of extraneous offenses must be relevant to a material issue in the case other than the defendant's character. *Rogers v. Peeler*, 146 S.W.3d 765, 774 (Tex. App.—Texarkana 2004, no pet.). The list of examples in Rule 404(b) is not exhaustive. *See Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). For example, when a defendant claims self-defense, the State, in order to show the defendant's intent, may show other violent acts where the defendant was an aggressor. *See Lemmons*, 75 S.W.3d at 523; *Robinson v. State*, 844 S.W.2d 925, 929 (Tex. App.—Houston [1st Dist.] 1992, no pet.) ("[a]n extraneous offense may be used to rebut a defensive theory, such as self-defense, even though this purpose is not mentioned in" Rule 404(b)).

Before otherwise relevant extraneous-offense evidence can be admitted, it must also satisfy the balancing test established in Rule of Evidence 403, which states that evidence is admissible if and only if its probative value is not substantially outweighed by its unfair prejudicial effect. Tex R. Evid. 403; *see Gigliobianco v. State*, 210 S.W.3d 637, 640 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d at 388–89.

**B.      Standard of review**

We review a trial court's ruling on the admissibility of extraneous offenses under an abuse-of-discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). If the trial court's ruling is within the zone of reasonable disagreement, we will uphold the ruling. *Id.* at 343–44. A court's ruling is generally within the zone of reasonable disagreement if the evidence shows: (1) an extraneous offense is relevant to a material, non-propensity issue; and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *Id.* at 344. We will uphold the trial court's ruling if it is correct on any theory of law. *Id.*

**C.      Analysis**

Appellant asserted self-defense and defense of another (Westrum). During opening arguments, defense counsel argued:

> The evidence will show that there was a dispute, because the decedent and the decedent's girlfriend, Amanda, brought up an incident to cause marital problems between [Appellant] and his wife/girlfriend, [Westrum]. The evidence will show that [Westrum] didn't initially say what the argument was about. She stayed quiet, because she was ashamed of the fact of what the argument was about. She was embarrassed, like most of us are, when there is marital discord and conflict. After the decedent and his girlfriend, Amanda, started trouble, they were asked to leave multiple times. Even though they were asked to leave once, they didn't. They were trespassing.
>
> .          .          .
>
> The evidence will be that the decedent rushed at my client, [Appellant]. And when he rushed at him, what did [Westrum] do, his wife? She stood in front of him to protect her husband. The decedent pushed her down so hard that she sustained injuries to her face. She was on the ground next to the trash cans. The evidence will show then that [Appellant] reasonably believed that him [sic] and [Westrum] were in danger from the decedent and he fired his gun to defend, not only himself, but his wife, which is his God given right to do.

11

At the hearing outside the jury's presence, the State explained to the trial court that the evidence was important because "this is the entire pretext of why this event even happened, this murder and this aggravated assault with a deadly weapon."

Because Appellant's testimony—that he was still afraid when he encountered Mathson and he thought Mathson was going to get a rifle—raised the issue of self-defense, his justification in brandishing the gun at Mathson became a material issue in the case. *See Lolmaugh v. State*, 514 S.W.2d 758, 759 (Tex. Crim. App. 1974) (recognizing that motive becomes an issue when an appellant makes an issue of self-defense). If believed, Vlasek's testimony served more than one non-propensity purpose. It provided the jury with an explanation, other than self-defense, for Appellant having and using the gun—his anger over discovering Westrum had stayed with Louvier and Amanda in May 2020. It further explained the context for Westrum leaving Appellant in May 2020 to stay with her mother and with Louvier and Amanda—she left Appellant because he attempted to smother her. Additionally, it demonstrated not only that Appellant acted as an aggressor in the recent past but also that his aggression involved the use of a deadly weapon. We conclude the testimony at issue was probative on the issue of Appellant's defensive theory and relevant in showing Appellant's state of mind and lack of mistake at the time he brandished the gun at Mathson. *De la Paz*, 279 S.W.3d at 343 (explaining that the Rule 404(b) exceptions are not exhaustive; "[t]he rule excludes only evidence that is offered (or will be used) solely for the purpose of providing bad character and hence conduct in conformity with that bad character."); *see also Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996) (en banc) ("if evidence 1) is introduced for a purpose other than character conformity, 2) has relevance to a fact of consequence in the case and 3) remains free of any other constitutional or statutory prohibitions, it is admissible.").

As for the alleged October 2020 extraneous offense, the State did nothing more than pose a series of questions to Westrum about the incident. Questions asked of a witness are not evidence. *See, e.g.*, *Madden v. State*, 242 S.W.3d 504, 513–15 (Tex. Crim. App. 2007) (recognizing questions posed by attorney are not evidence); *Wiggins v. State*, 778 S.W.2d 877, 890 (Tex. App.—Dallas 1989, pet. ref'd) ("[A]nswers, not questions, constitute evidence."). The State asked Westrum about the day she stayed at Mathson's home in October 2020, and she consistently denied any abuse. Because the State's questions are not evidence and the questions did not elicit any substantive answers from Westrum, the mere fact that the State asked questions did not, in itself, inject any extraneous-offense evidence into the record.

Regardless, the State was permitted to rebut Appellant's defensive theory by introducing evidence of extraneous offenses in which Appellant was the aggressor in the past. *See Lemmons*, 75 S.W.3d at 523 (concluding in murder case where defendant claimed self-defense that it was not an abuse of discretion to admit testimony concerning an extraneous robbery offense to show defendant "had acted as a first aggressor in the past"); *see also Ferris v. State*, No. 08-18-00222-CR, 2020 WL 8768947, at *6 (Tex. App.—El Paso Dec. 11, 2020, no pet.) (not designated for publication) ("And as Ferris made self-defense a relevant theory at trial through both his opening statement and cross-examination, the State was permitted to show other violent acts where Ferris was an aggressor in order to rebut that theory."); *Render v. State*, 347 S.W.3d 905, 921 (Tex. App.—Eastland 2011, pet. ref'd) (holding "evidence of appellant's [prior] assault of Mike was admissible under Rule 404(b) to show appellant's intent and to rebut his theory of self-defense").

We conclude the trial court's ruling that the extraneous offenses were relevant for a non-propensity purpose was within the zone of reasonable disagreement. *See De La Paz*, 279 S.W.3d

at 344. Therefore, we next consider Appellant's argument that the evidence should have been excluded because its probative value was substantially outweighed by a danger of unfair prejudice.

> When a trial court considers a Rule 403 objection, it must balance the following factors:
>
> . . . (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and (4) the proponent's need for the evidence.

*Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022). A ruling on the balance between probative value and the counter-factors set out in Rule 403 is a question for the trial court. *De La Paz*, 279 S.W.3d at 343. "[T]hat balance is always slanted toward admission, not exclusion, of otherwise relevant evidence." *Id.* We will defer to the trial court's balancing of these factors so long as it is not outside the zone of reasonable disagreement. *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (en banc).

We first examine how compellingly the extraneous-offense evidence tended to disprove Appellant's defensive theory. Appellant contended he was still afraid when he encountered Mathson and he thought Mathson was going to get a rifle. Whether Appellant acted in self-defense was a hotly contested issue at trial. When an issue at trial is "hotly contested," the State has a strong need for the evidence the defendant wishes to exclude. *See Lane*, 933 S.W.2d at 521 ("Hence, identity was a hotly contested issue, and the integrity of appellant's 'Bertha' confessions was of critical importance to the State."); *Lawson v. State*, No. 13-22-00182-CR, 2023 WL 5124697, at *7 (Tex. App.—Corpus Christi-Edinburg Aug. 10, 2023, no pet.) (mem. op., not designated for publication) (holding extraneous-offense evidence was "of critical importance to the State" based on the State's argument that the extraneous-offense testimony "was the main evidence it had to rebut Lawson's claim of self-defense").

Next, we analyze the potential for the extraneous-offense evidence to impress the jury in some irrational, but indelible, way. On appeal, Appellant contends testimony that he was violent and abusive towards Westrum reached a level that was "so horrifying that a juror of normal sensitivity would necessarily have difficulty rationally deciding the critical issues of the case" after hearing it. *See Alvarado v. State*, 912 S.W.2d 199, 212 (Tex. Crim. App. 1995) (en banc), *overruled on other grounds by Warner v. State*, 245 S.W.3d 458 (Tex. Crim. App. 2008). We disagree.

"[T]he plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). "Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Id.* The question in a Rule 403 analysis is whether the evidence was *unfairly* prejudicial. *See Caston v. State*, 549 S.W.3d 601, 612–13 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (acknowledging "evidence that appellant sexually abused another child in addition to the complainant in the charged offense was clearly prejudicial to his case," but he did not establish it "was unfairly prejudicial"). Here, although the extraneous-offense evidence may have been prejudicial, Appellant has not shown that the evidence was *unfairly* prejudicial.

Further, although using a pillow to try to smother Westrum and threatening Mathson with a gun both involve use of a deadly weapon, neither extraneous offense was similar to the indicted offense. *Cf., Halliburton v. State*, 528 S.W.2d 216, 219 (Tex. Crim. App. 1975) ("The presence or absence of similarity is not entirely determinative of the admissibility of the extraneous offense. If the extraneous offense is relevant in tending to disprove the defensive theory, it should be admissible."); *Beam v. State*, 447 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (holding that "[w]henever the extraneous offense is similar to the charged offense, there is always a potential that the jury may be unfairly prejudiced by the defendant's character

conformity"); *Keller v. State*, 818 S.W.2d 425, 429 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd) ("Appellant's repeated failure to pay in the four transactions allowed in evidence leads logically to the inference that he lacked the intent to pay in the present instance.").

We may also consider the jury charge when determining whether the extraneous-offense evidence had a misleading effect. *Blackwell v. State*, 193 S.W.3d 1, 15 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("The trial court's instructions to the jury are a factor to consider in determining whether the jury considered the extraneous-offense evidence improperly, i.e., as character conformity evidence, or properly, as evidence to rebut a defensive theory or some other permissible reason under rule 404(b)."). As a general rule, we presume the jury will follow the trial court's instructions in the manner presented in the charge. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

Here, the trial court mitigated any tendency of the extraneous-offense evidence to confuse or distract the jury from the main issues at trial by its charge. Specifically, the trial court identified for the jury the elements the State was required to prove by its indictment and instructed the jury that it could consider the extraneous-offense evidence only if it found Appellant had committed the extraneous offenses beyond a reasonable doubt, and then, if it made that finding, that it could only consider the evidence for its bearing on matters relevant to determining whether Appellant committed the acts alleged in the indictment. The jury instruction properly limited the jury's consideration of the extraneous-offense evidence to issues other than character conformity, such as to refute a defensive theory, and therefore minimized the potential misleading effect of the evidence.

Finally, Vlasek's testimony about the extraneous offense is a relatively short portion of the State's case-in-chief. Because she had knowledge of other relevant matters, her testimony spans

16

approximately 87 pages of the reporter's record; however, less than one page of her testimony was dedicated to specifically addressing the extraneous offense. The State's attempt to cross-examine Westrum about the October 2020 incident is less than three pages and amounted to no substantive evidence. Appellant called seven witnesses to testify in his case-in-chief. By comparison, the State's entire case-in-chief included seven other witnesses and over 100 exhibits, and the State did not refer to either extraneous offense in its closing argument. The jury charge also cautioned the jurors that any notes they took were not evidence, statements made by and questions asked by the lawyers were not evidence, and the evidence consisted only of the testimony and exhibits admitted in the trial.

Based on our review of the relevant factors, we conclude the trial court did not abuse its discretion in determining that the probative value of the extraneous-offense evidence was not outweighed by its prejudicial effect.

## CONCLUSION

For the reasons stated above, we overrule Appellant's sole issue on appeal and affirm the trial court's judgment.

LISA J. SOTO, Justice

April 30, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)

17