

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DAMACIO SANDOVAL, JR. | § | No. 08-23-00231-CR |
| Appellant, | § | Appeal from the |
| v. | § | 198th Judicial District Court |
| THE STATE OF TEXAS, | § | of Kerr County, Texas |
| Appellee. | § | (TC# B21-472) |

### MEMORANDUM OPINION[1]

A jury found Appellant Damacio Sandoval, Jr. guilty of murder for the shooting death of Patrick Louvier and assessed punishment at 55 years' confinement. In a single issue on appeal, Appellant asserts the trial court erred by admitting testimony about prior extraneous offenses involving domestic violence. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Because Appellant does not raise an issue challenging the sufficiency of the evidence to support his conviction, we only briefly discuss the background of the evening on which Louvier

---

[1] The appeal was transferred to this Court from the Fourth Court of Appeals pursuant to a Texas Supreme Court docket equalization order. Accordingly, we apply the Fourth Court of Appeals' precedent to the extent it conflicts with our own. *See* Tex. R. App. P. 41.3.

was killed. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

At trial, several witnesses testified about the evening on which Appellant shot and killed Patrick Louvier. A large group of family and friends was gathered at the home of Appellant's mother-in-law, Cynthia Vlasek, to celebrate a family member's life the day before his funeral. A guest, Courtney Garrison, testified that she was sitting outside on the porch with Appellant, Appellant's common-law wife (Cara Westrum), Louvier, and Louvier's girlfriend (Amanda).[2] According to Garrison, Westrum had a black eye and busted blood vessel, but she did not talk to Westrum about the injury. Garrison testified that Amanda said to Westrum, "Hey, do you remember that weekend that you came down here and we got fucked up and we partied at my house?" Garrison said Appellant then "stood up from the table and his complete demeanor changed. . . . [A]nd as soon as that was said, he clearly got very angry." Garrison stated Amanda and Louvier started to leave after being asked to do so by Vlasek, but Appellant "kept taunting them, saying inappropriate things, trying to get a rise out of him" as Louvier was walking toward his car.

Two other guests, Braxton Mathson and Johnny Tisdale, testified that they heard yelling and arguing just before the shooting. Mathson testified that on the day of the shooting, he and another man were working on a handrail on some stairs for an elderly relative who also lived on the property. When he heard six or seven gunshots, he ran to the porch of Vlasek's house to check on his wife and several children who were in the area. As he ran towards the porch, he saw Appellant holding a gun. Tisdale said he heard Appellant tell Louvier to leave in a derogatory

---

[2] Amanda, whose full name is not identified in the record, did not testify at trial.

manner, then he saw Louvier swing around the table toward Appellant, and Appellant pulled out a gun and started to shoot Louvier. By the time law enforcement arrived, Louvier was deceased on the ground with multiple gunshot wounds.[3]

Appellant and Westrum both testified for the defense. There is no dispute Appellant shot and killed Louvier; however, Appellant asked for and received instructions on self-defense and defense of another in the jury charge. Westrum testified that Appellant and Louvier had never met before the evening of the shooting. She said she went and drank with Amanda and Louvier when she left Georgetown to visit with her mother and stayed with Amanda and Louvier for a week following an argument and break-up with Appellant. Westrum said that the evening of the shooting, Amanda said to her, "Hey, remember that time we were drinking together at my house?" Westrum was upset because she had not told Appellant about the time she spent with Amanda and Louvier.

Westrum said Appellant and Louvier argued and Louvier told her and Appellant "he had a gun and was going to pull it out and kill us both, me and [Appellant]." She said that after she asked her mother to ask Amanda and Louvier to leave, she went back outside where Louvier and Appellant were exchanging "cuss words." She said Louvier was walking away a little bit with Amanda then turned back around and knocked her to the ground where she hit her face. When the police arrived, Westrum told them Appellant acted in self-defense and to protect her.

When Appellant was asked about what led to him shooting Louvier, Appellant testified that they were sitting around and he was talking to his wife's cousin when Amanda interrupted them, referencing a time "when we were getting fucked up." After being asked who Amanda was referring to, Appellant testified as follows:

---

[3] The medical examiner testified to eight gunshot wounds.

3

A. I would have to say [Westrum], because shortly after that, she . . . looked upset and she walked inside [Vlasek's house].

Q. And then what happened when [Westrum] looked upset and was walking inside?

A. I heard–I heard somebody yell, "Why are you acting like a little bitch?"

Q. And who did that?

A. [Louvier].

Q. And when he said that, what did you do?

A. I looked at him.

Q. And then what did he say?

A. He said "What's up, mother fucker? I got my gun on me. I keep it on me since my brother was killed."

Appellant explained he then walked away and went to Westrum's vehicle to retrieve his own gun because he "had just been threatened with a gun" and did not feel safe. Appellant said he had never met Louvier before that night.

According to Appellant, Louvier was told to leave the gathering and when he refused, he and Appellant started to argue over him leaving, yelling at each other in a derogatory manner. At some point during the argument, Appellant, who was facing away from Westrum, said he did not know whether Louvier hit Westrum or pushed her; he just heard "her hit the ground." Appellant said he turned around, saw Westrum on the ground, and then shot Louvier several times. Appellant was arrested at the scene and charged with the murder of Louvier.[4]

---

[4] Appellant also was arrested and charged with aggravated assault with a deadly weapon. The aggravated assault indictment charged Appellant with intentionally or knowing threatening Braxton Mathson with imminent bodily injury by pointing a firearm at him. Both charges were tried together before the same jury. Appellant was convicted of the aggravated assault charge and appealed that conviction in a separate companion appeal labeled cause number 08-23-000232-CR.

## TESTIMONY ABOUT THE EXTRANEOUS OFFENSES

On appeal, Appellant complains about the admission of two extraneous offenses into evidence: (1) Westrum's telephone call to Vlasek in May 2020 regarding Appellant trying to smother Westrum with a pillow; and (2) an offense in October 2020 that "involved an unspecified alleged assault committed by [Appellant] against" Westrum.[5]

Because the State intended to introduce the May 2020 extraneous offense through Vlasek's testimony, defense counsel requested a hearing outside the jury's presence prior to her testifying. The State argued that the testimony about the May 2020 offense was the "entire pretext" for why the shooting happened and was relevant to Appellant's motive, intent, and lack of mistake as well as to rebut Appellant's defensive theories. The State also wanted to introduce an October 2020 incident of domestic abuse.[6] Defense counsel objected that the testimony was prohibited because the State was trying to show Appellant was a violent person. The trial court indicated it would allow testimony about both extraneous offenses.

### A. Vlasek's testimony about the May 2020 extraneous offense

Vlasek testified that about a year before the shooting, she received a telephone call from her daughter, during which Westrum said, "Mom, I left him." "He tried to kill me. He put a pillow

---

[5] On appeal, the State contends Appellant "properly preserved" his Rule 404(b) complaint, but then contends he waived "the issue" by not requesting a limiting instruction. The State does not identify the waived "issue." We believe the State refers to Rule of Evidence 105, which provides that when a "court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on request, must restrict the evidence to its proper scope and instruct the jury accordingly." Tex. R. Evid. 105(a). "A party may claim error in a ruling to admit evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—only if the party requests the court to restrict the evidence to its proper scope and instruct the jury accordingly." *Id.* at 105(b)(1). On appeal, Appellant does not argue that extraneous-offense evidence should have been admitted only for a limited purpose, and he does not raise an "issue" on appeal that the trial court erred by not giving a limiting instruction when the extraneous-offense evidence was first offered.

[6] The State initially wanted to introduce this extraneous offense through Braxton Mathson's testimony, but the trial court did not allow it. Later, the trial court allowed the State to question Westrum about the alleged incident.

over my face, tried to suffocate me. I had to kick him in the groin to get him off."[7]  According to Vlasek, Westrum stayed with her for a time after that call and also stayed with Louvier and Amanda, who was around the same age as Westrum. Ultimately, after about a week, Westrum went back to Appellant.

A year later, on the night of the shooting, Vlasek, who was hosting the family gathering, was inside her house when Westrum came in upset. Vlasek testified,

> I had walked into the kitchen from outside and [Westrum] said, "Mom, mom, mom, come here." And she was upset. She was shaking, voice was trembling. She said, "Amanda and [Louvier] brought up the time I spent with them and [Appellant] didn't know about it, and now he is angry and I'm scared. He's pissed, and I'm scared. He is going to kill me. He is going to make me and [our daughter] leave and he is going to kill me," is what she said.

Westrum asked Vlasek to ask Louvier and Amanda to leave. Vlasek then described her conversation with Amanda:

> I called for Amanda to come in the house and took her in the back, in my room, and I spoke to her privately and said, "You know, Cara asked you not to talk about that week. You know how angry he can get." And she said, "Well, I forgot." And she said, "What should we do? Should we leave?" . . . By the time we walked back out on the patio, [Appellant] was still angry. . . . And so I said, "Yeah, y'all better go ahead and leave." So, they proceeded to go to their car. . . . [Appellant was] walking around, not saying much to everybody else. He was aggravating [Louvier], making rude comments to him.

### B.   Westrum's testimony about an alleged October 2020 incident

Appellant called Westrum as a defense witness, and during her cross-examination, the State attempted to elicit testimony about an incident in October 2020:

> Q.   Now, in October of 2020, it's been testified to that you moved–you and [your daughter] moved in with Addie and Mathson into their house in Georgetown; isn't that correct?
>
> A.   No.

---

[7] When Westrum testified for the defense, she denied Appellant tried to smother her with a pillow.

6

Q. And, in fact, the reason why you moved in from there is because [Appellant] had strangled you and tried to kill you, and they allowed for you to immediately move, you and [your daughter], into their house; isn't that correct?

A. No.

Q. And from there, that same night that y'all moved in, . . . you were going to leave . . . your daughter, with them to go to a Halloween party with [Appellant], the same man that had just strangled you; isn't that correct?

A. We did go to a Halloween party, but he did not strangle me.

Q. And, in fact–in fact, when [Mathson] found out that you were going to return to [Appellant] that same night and dump your daughter with them, that he told you—

. . .

Q. He told you, "If you go to that party, pack your bags and take [your daughter], because you are not going to live here. I'm not going to enable you to live with this abusive relationship anymore;" isn't that correct?

A. I do not recall.

Q. You don't recall?

A. No.

Q. So, if Braxton testified to that, he would be a liar?

A. I don't know. You should ask him.

Q. I did ask him, and that was his answer.[8]

A. I don't remember.

---

[8] Our review of Mathson's testimony before the jury reveals the State never asked Mathson anything more than whether Westrum stayed with him and his wife. Mathson said she stayed for only one day in October 2020. He did not elaborate on why Westrum stayed at his home or testify about any conversation he had with Westrum.

DISCUSSION

On appeal, Appellant asserts evidence of the extraneous offenses was improperly admitted for the sole purpose of showing character conformity in violation of Texas Rule of Evidence 404(b), and the probative value of the evidence was outweighed by its inflammatory or prejudicial effect. The State argued evidence regarding the extraneous offenses was relevant "to establish some elemental facts, such as identity or intent; . . . tends to establish some evidentiary fact, such as motive, opportunity, or preparation, leading inferentially to an elemental fact; or . . . rebuts a defensive theory[.]"

## A. Applicable law

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at 404(b)(2); *see also Lemmons v. State*, 75 S.W.3d 513, 523 (Tex. App.—San Antonio 2002, pet. ref'd). "Extraneous offense evidence that logically serves any of these purposes is relevant beyond its tendency to prove the character of a person to show that he acted in conformity therewith." *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990) (en banc). In other words, evidence of extraneous offenses must be relevant to a material issue in the case other than the defendant's character. *Rogers v. Peeler*, 146 S.W.3d 765, 774 (Tex. App.—Texarkana 2004, no pet.). The list of examples in Rule 404(b) is not exhaustive. *See Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). When a defendant claims self-defense, the State, in order to show the defendant's intent, may show other violent acts where the defendant was an aggressor. *See Lemmons*, 75 S.W.3d at 523; *Robinson v. State*, 844 S.W.2d 925, 929 (Tex. App.—

Houston [1st Dist.] 1992, no pet.) ("[a]n extraneous offense may be used to rebut a defensive theory, such as self-defense, even though this purpose is not mentioned in" Rule 404(b)).

Before otherwise relevant extraneous-offense evidence can be admitted, it must also satisfy the balancing test established in Rule of Evidence 403, which states that evidence is admissible if and only if its probative value is not substantially outweighed by its unfair prejudicial effect. Tex. R. Evid. 403; *see Gigliobianco v. State*, 210 S.W.3d 637, 640 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d at 388–89.

## B.  Standard of review

We review a trial court's ruling on the admissibility of extraneous offenses under an abuse-of-discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). If the trial court's ruling is within the zone of reasonable disagreement, we will uphold the ruling. *Id.* at 343–44. A court's ruling is generally within the zone of reasonable disagreement if the evidence shows: (1) an extraneous offense is relevant to a material, non-propensity issue; and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *Id.* at 344. We will uphold the trial court's ruling if it is correct on any theory of law. *Id.*

## C.  Analysis

Appellant asserted self-defense and defense of another (Westrum). During opening arguments, defense counsel argued:

> The evidence will show that there was a dispute, because the decedent and the decedent's girlfriend, Amanda, brought up an incident to cause marital problems between [Appellant] and his wife/girlfriend, [Westrum]. The evidence will show that [Westrum] didn't initially say what the argument was about. She stayed quiet, because she was ashamed of the fact of what the argument was about. She was embarrassed, like most of us are, when there is marital discord and conflict. After the decedent and his girlfriend, Amanda, started trouble, they were asked to leave

9

multiple times. Even though they were asked to leave once, they didn't. They were trespassing.

.     .     .

The evidence will be that the decedent rushed at my client, [Appellant]. And when he rushed at him, what did [Westrum] do, his wife? She stood in front of him to protect her husband. The decedent pushed her down so hard that she sustained injuries to her face. She was on the ground next to the trash cans. The evidence will show then that [Appellant] reasonably believed that him [sic] and [Westrum] were in danger from the decedent and he fired his gun to defend, not only himself, but his wife, which is his God given right to do.

At the hearing outside the jury's presence, the State argued the evidence of extraneous conduct was admissible to show Appellant's motive and intent. The State explained to the trial court and reiterates on appeal that "the genesis of the murder . . . can be traced to Appellant's wife, Cara Westrum, fleeing for her safety after being suffocated by Appellant in May 2020." Appellant countered that he and Louvier did not know each other, and his motive in shooting Louvier was defensive.

Because Appellant raised self-defense and defense of another, his justification in shooting Louvier became a material issue in the case. *See Lolmaugh v. State*, 514 S.W.2d 758, 759 (Tex. Crim. App. 1974) (recognizing that motive becomes an issue when an appellant makes an issue of self-defense). If believed, Vlasek's testimony served more than one non-propensity purpose. It provided the jury with a motive for Appellant shooting a man he had never met before—his anger over discovering Westrum had stayed with Louvier and Amanda in May 2020. It further explained the context for Westrum leaving Appellant in May 2020 to stay with her mother and with Louvier and Amanda—she left Appellant because he attempted to smother her. Additionally, it demonstrated Appellant acted as an aggressor in the recent past. We conclude the testimony at issue was probative on the issue of Appellant's defensive theories and relevant in showing Appellant's state of mind at the time of the shooting. *De la Paz*, 279 S.W.3d at 343 (explaining

10

that the Rule 404(b) exceptions are not exhaustive; "[t]he rule excludes only evidence that is offered (or will be used) solely for the purpose of providing bad character and hence conduct in conformity with that bad character."); *see also Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996) (en banc) ("if evidence 1) is introduced for a purpose other than character conformity, 2) has relevance to a 'fact of consequence' in the case and 3) remains free of any other constitutional or statutory prohibitions, it is admissible").

As for the alleged October 2020 extraneous offense, the State did nothing more than pose a series of questions to Westrum about the incident. Questions asked of a witness are not evidence. *See, e.g.*, *Madden v. State*, 242 S.W.3d 504, 513–15 (Tex. Crim. App. 2007) (recognizing questions posed by attorney are not evidence); *Wiggins v. State*, 778 S.W.2d 877, 890 (Tex. App.—Dallas 1989, pet. ref'd) ("[A]nswers, not questions, constitute evidence."). The State asked Westrum about the day she stayed at Mathson's home in October 2020, and she consistently denied any abuse. Because the State's questions are not evidence and the questions did not elicit any substantive answers from Westrum, the mere fact that the State asked questions did not, in itself, inject any extraneous-offense evidence into the record.

Regardless, the State was permitted to rebut Appellant's defensive theories by introducing evidence of extraneous offenses in which Appellant was the aggressor in the past. *See Lemmons*, 75 S.W.3d at 523 (concluding in murder case where defendant claimed self-defense that it was not an abuse of discretion to admit testimony concerning an extraneous robbery offense to show defendant "had acted as a first aggressor in the past"); *see also Ferris v. State*, No. 08-18-00222-CR, 2020 WL 8768947, at *6 (Tex. App.—El Paso Dec. 11, 2020, no pet.) (not designated for publication) ("And as Ferris made self-defense a relevant theory at trial through both his opening statement and cross-examination, the State was permitted to show other violent acts where Ferris

was an aggressor in order to rebut that theory."); *Render v. State*, 347 S.W.3d 905, 921 (Tex. App.—Eastland 2011, pet. ref'd) (holding "evidence of appellant's [prior] assault of Mike was admissible under Rule 404(b) to show appellant's intent and to rebut his theory of self-defense").

We conclude the trial court's ruling that the extraneous offenses were relevant for a non-propensity purpose was within the zone of reasonable disagreement. *See De La Paz*, 279 S.W.3d at 344. Therefore, we next consider Appellant's argument that the evidence should have been excluded because its probative value was substantially outweighed by a danger of unfair prejudice.

When a trial court considers a Rule 403 objection, it must balance the following factors:

> . . . (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and (4) the proponent's need for the evidence.

*Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022). A ruling on the balance between probative value and the counter-factors set out in Rule 403 is a question for the trial court. *De La Paz*, 279 S.W.3d at 343. "[T]hat balance is always slanted toward admission, not exclusion, of otherwise relevant evidence." *Id.* We will defer to the trial court's balancing of these factors so long as it is not outside the zone of reasonable disagreement. *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (en banc).

We first examine how compellingly the extraneous-offense evidence tended to disprove Appellant's defensive theories. Appellant contended he did not know Louvier and it appeared to him that Louvier had either punched or pushed Westrum, knocking her to the ground. Appellant said he retrieved his own gun because he felt threatened by Louvier. Westrum said Louvier told her and Appellant "he had a gun and was going to pull it out and kill us both, me and [Appellant]."

12

Whether Appellant acted in self-defense or in defense of another was a hotly contested issue at trial. When an issue at trial is "hotly contested," the State has a strong need for the evidence the defendant wishes to exclude. *See Lane*, 933 S.W.2d at 521 ("Hence, identity was a hotly contested issue, and the integrity of appellant's 'Bertha' confessions was of critical importance to the State."); *Lawson v. State*, No. 13-22-00182-CR, 2023 WL 5124697, at *7 (Tex. App.—Corpus Christi-Edinburg Aug. 10, 2023, no pet.) (mem. op., not designated for publication) (holding extraneous-offense evidence was "of critical importance to the State" based on the State's argument that the extraneous-offense testimony "was the main evidence it had to rebut Lawson's claim of self-defense").

Next, we analyze the potential for the extraneous-offense evidence to impress the jury in some irrational, but indelible, way. On appeal, Appellant contends testimony that he was violent and abusive towards Westrum reached a level that was "so horrifying that a juror of normal sensitivity would necessarily have difficulty rationally deciding the critical issues of the case" after hearing it. *See Alvarado v. State*, 912 S.W.2d 199, 212 (Tex. Crim. App. 1995) (en banc), *overruled on other grounds by Warner v. State*, 245 S.W.3d 458 (Tex. Crim. App. 2008). We disagree.

"[T]he plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). "Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Id.* The question in a Rule 403 analysis is whether the evidence was *unfairly* prejudicial. *See Caston v. State*, 549 S.W.3d 601, 612–13 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (acknowledging "evidence that appellant sexually abused another child in addition to the complainant in the charged offense was clearly prejudicial to his case," but he did not establish it

13

"was unfairly prejudicial"). Here, although the extraneous-offense evidence may have been prejudicial, Appellant has not shown that the evidence was *unfairly* prejudicial.

Further, neither extraneous offense was similar to the indicted offense. *Cf., Halliburton v. State*, 528 S.W.2d 216, 219 (Tex. Crim. App. 1975) ("The presence or absence of similarity is not entirely determinative of the admissibility of the extraneous offense. If the extraneous offense is relevant in tending to disprove the defensive theory, it should be admissible."); *Beam v. State*, 447 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (holding that "[w]henever the extraneous offense is similar to the charged offense, there is always a potential that the jury may be unfairly prejudiced by the defendant's character conformity"); *Keller v. State*, 818 S.W.2d 425, 429 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd) ("Appellant's repeated failure to pay in the four transactions allowed in evidence leads logically to the inference that he lacked the intent to pay in the present instance.").

We may also consider the jury charge when determining whether the extraneous-offense evidence had a misleading effect. *Blackwell v. State*, 193 S.W.3d 1, 15 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("The trial court's instructions to the jury are a factor to consider in determining whether the jury considered the extraneous-offense evidence improperly, i.e., as character conformity evidence, or properly, as evidence to rebut a defensive theory or some other permissible reason under rule 404(b)."). As a general rule, we presume the jury will follow the trial court's instructions in the manner presented in the charge. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

Here, the trial court mitigated any tendency of the extraneous-offense evidence to confuse or distract the jury from the main issues at trial by its charge. Specifically, the trial court identified for the jury the elements the State was required to prove by its indictment and instructed the jury

that it could consider the extraneous-offense evidence only if it found Appellant had committed the extraneous offenses beyond a reasonable doubt, and then, if it made that finding, that it could only consider the evidence for its bearing on matters relevant to determining whether Appellant committed the acts alleged in the indictment. The jury instruction properly limited the jury's consideration of the extraneous-offense evidence to issues other than character conformity, such as to refute a defensive theory, and therefore minimized the potential misleading effect of the evidence.

Finally, Vlasek's testimony about the extraneous offense is a relatively short portion of the State's case-in-chief. Because she had knowledge of other relevant matters, her testimony spans approximately 87 pages of the reporter's record; however, less than one page of her testimony was dedicated to specifically addressing the extraneous offense. The State's attempt to cross-examine Westrum about the October 2020 incident is less than three pages and amounted to no substantive evidence. Appellant called seven witnesses to testify in his case-in-chief. By comparison, the State's entire case-in-chief included seven other witnesses and over 100 exhibits, and the State did not refer to either extraneous offense in its closing argument. The jury charge also cautioned the jurors that any notes they took were not evidence, statements made by and questions asked by the lawyers were not evidence, and the evidence consisted only of the testimony and exhibits admitted in the trial.

Based on our review of the relevant factors, we conclude the trial court did not abuse its discretion in determining that the probative value of the extraneous-offense evidence was not outweighed by its prejudicial effect.

## CONCLUSION

For the reasons stated above, we overrule Appellant's sole issue on appeal and affirm the trial court's judgment.

LISA J. SOTO, Justice

April 30, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)